684 F.2d 31
 221 U.S.App.D.C. 257
 PAN AMERICAN WORLD AIRWAYS, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
City of New Orleans et al., American Airlines, Inc., and
Continental Air Lines, Inc., Intervenors.
DELTA AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
American Airlines, Inc., Intervenor.
TRANS WORLD AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
 Nos. 82-1547, 82-1548 and 82-1552.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 21, 1982.
Decided July 23, 1982.
As Amended July 23, 1982.
 
 Appeal from award by Civil Aeronautics Board of interim authority to operate abandoned international routes.
 Michael J. Roberts, with whom James M. Verner and Russell E. Pommer, Washington, D. C., were on the brief, for petitioner Pan American World Airways, Inc. Richard L. Cys, Washington, D. C., entered an appearance for petitioner Pan American World Airways, Inc.
 Robert Reed Gray, with whom Louis H. Kurrelmeyer, Benjamin R. Achenbach, Jr., Washington, D. C., James W. Callison, and Don M. Adams, Atlanta, Ga., were on the brief, for petitioner Delta Air Lines, Inc.
 Edmund E. Harvey, Washington, D. C., was on the brief for petitioner Trans World Airlines, Inc.
 Thomas L. Ray, Acting Associate Gen. Counsel, C. A. B., with whom Ivars V. Mellups, Acting Gen. Counsel, and David Schaffer, Atty., C. A. B., and John J. Powers, III, and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent.
 J. William Doolittle, with whom Alfred V. J. Prather and Carl B. Nelson, Jr., Washington, D. C., were on the brief, for intervenor American Airlines, Inc.
 Emory N. Ellis, with whom Patrick J. Keeley, Washington, D. C., was on the brief, for intervenor Continental Air Lines, Inc.
 Before WRIGHT, TAMM and WILKEY, Circuit Judges.
 Opinion for the court PER CURIAM.
 
 
 1
 Dissenting opinion filed by Circuit Judge WILKEY.
 
 PER CURIAM:
 
 2
 These three consolidated cases arise from the award by the Civil Aeronautics Board (CAB or Board), in an extremely short timeframe, of interim authority to operate international routes abandoned by Braniff[1] when it sought reorganization in bankruptcy on May 13, 1982. Petitioners Pan Am, Delta, and TWA challenge the CAB's decision to award Dallas/Fort Worth (DFW)-London authority to American. Pan Am alone challenges the award of Central Zone-Venezuela authority to Continental.[2] The decision falls far short of the ideal in administrative processes, and the CAB acted illegally in one respect.[3] This single illegality, however, is not properly remedied by setting aside the agency's action, and the CAB otherwise responded reasonably to the emergency facing it. Applying "the traditional (standard) of reasonableness," Air Line Pilots Ass'n, Int'l v. CAB, 494 F.2d 1118, 1123 n.15 (D.C.Cir.1974), we affirm. We also order the CAB to complete certificate proceedings, awarding long-term authority to fly these routes, within six months.
 
 I. Background
 
 3
 On Thursday, May 13, 1982, Braniff filed for reorganization in bankruptcy. Although it was known throughout the industry that Braniff was in dire financial straits,[4] there was no advance warning of the bankruptcy filing until Braniff shut down all its operations late on May 12. At a Thursday morning press conference the CAB announced that it would accept emergency applications for temporary exemption authority, see 49 U.S.C. § 1386(b) (1976 & Supp. III 1979) (allowing CAB to exempt carriers from, inter alia, certificate requirement for international routes), on Braniff's abandoned routes until 10:00 A.M. the following day. At some later time on May 13 the CAB announced that it would hold a closed meeting at 2:00 P.M. on May 14 to consider the applications received.
 
 
 4
 The CAB received 18 applications by its stated deadline.[5] It also received various supplements and oppositions on May 14, including two pleadings from Delta commenting on other carriers' applications. Pan Am and TWA did not file oppositions within the severely limited timeframe available. All of the parties to this case specifically requested emergency treatment, and American specifically requested that the CAB, pursuant to 14 C.F.R. § 302.410 (1981), not await responses before acting. The CAB did meet from 2:00 to 4:00 P.M. in closed session,[6] and at approximately 6:40 P.M. its staff released Order 82-5-77, which designated American and Continental for the London and Venezuela exemption authority, respectively.[7] Order 82-5-77 explained that the unprecedented Braniff bankruptcy, brought on without advance notice, had created an emergency requiring the CAB to act. It contained no explanation of why it was "consistent with the public interest" to grant these particular requests, and no explanation of why the awards of exemption authority would "continue until April 23, 1983, or until final Board action involving each route, whichever occurs first." Instead, the CAB said it had directed its staff to prepare an order containing its detailed findings and conclusions, to be released at some unspecified future time.
 
 
 5
 By 5:00 P.M. the next day (Saturday, May 15) Pan Am and Delta had prepared petitions for review and emergency stay motions, which they lodged at the guard's desk in this courthouse. The papers were extensive. Pan Am and Delta emphasized that they (and TWA), unlike American, already had facilities and operations in London. Pan Am also emphasized that it, unlike Continental, had facilities and operations in Venezuela. By 4:00 P.M. on Monday, May 17, TWA had filed a largely identical petition and motion, and the CAB, American, Continental, and aspiring intervenors the New Orleans parties had filed oppositions. These papers were also extensive. Replies were filed the next morning (Tuesday, May 18). On Tuesday, May 18, we denied all stay motions but expedited the case. American's first Dallas-London flight took place on May 19. Continental did not fly between the Central Zone points and Venezuela until July 3 (after we heard oral argument), because its ongoing negotiations with the Venezuelan government for the necessary permission to fly were until early July unsuccessful.
 
 
 6
 On May 27, 1982 the CAB issued Order 82-5-145, which contained the promised detailed findings and conclusions. The CAB declared that it had "select(ed) for temporary exemption authority those carriers that could most closely duplicate Braniff's service, institute replacement service with requisite speed, and maintain the existing competitive market structure pending a review of the routes in future proceedings." Order 82-5-145 at 5. It also declared: "Since these factors focus on the pressing need for replacement service in the short-term, they leave us the flexibility needed to decide long-term issues in subsequent proceedings." Id. With respect to the doctrine that short-term awards should be made in such a way as to minimize prejudice to long-term awards,[8] the CAB stated that there were compelling public-interest reasons favoring the selection of American and Continental, and that these factors overcame the potential prejudice that might arise from selection of carriers who had no current operations at the foreign airports involved. The CAB also declared that the necessary expenditures of funds by American to move into the London market were, compared to potential revenues, so insubstantial that no prejudice would arise in the proceedings on long-term certificate authority for these routes. Id. at 12-13 & n.36. Finally, the CAB asserted that its eleven-month awards were justified by the need to allow carriers "time to stabilize their operations," by the need to protect carriers who would apply for certificate (long-term) authority, and by the need "to recognize Braniff's reorganization efforts." Id. at 14. Chairman McKinnon and Member Schaffer dissented in part, saying they would have given DFW-London to Pan Am. Member Dalley dissented in part, saying he would have given Central Zone-Venezuela to Pan Am.
 
 
 7
 All briefs were filed in this court on or before June 14. Pan Am, Delta, and TWA attack Order 82-5-145 as both a post hoc rationalization and arbitrary considered on its own merit. The CAB, American, and Continental support the order. The New Orleans parties have filed a short brief in which they simply emphasize New Orleans' need for nonstop service to Venezuela and argue that the award to Continental should be upheld because New Orleans has been without such service since Braniff shut down.II. The CAB's Closed Meeting
 
 
 8
 Our recent decision in Common Cause v. NRC, 674 F.2d 921 (D.C.Cir.1982), should have sufficed to put every multi-member agency of the federal government on notice of its duties under the Government in the Sunshine Act, 5 U.S.C. § 552b (1976). Section 552b(b) states the broad requirement that "every portion of every meeting * * * be open to public observation." The Act provides that this requirement "shall not apply to any portion of an agency meeting * * * where the agency properly determines that such portion or portions of its meeting" fall within one or more of ten specific, narrow exemptions. 5 U.S.C. § 552b(c) (1976) (emphasis added). Thus we summarized the statutory scheme in Common Cause: "Every meeting of a multi-member agency must be open to the public, except that specific portions of a meeting may be closed if the discussion is reasonably likely to fall within one or more of ten narrowly defined exemptions." 674 F.2d at 928 (emphasis added).
 
 
 9
 There was absolutely no warrant for the CAB to close its entire May 14 meeting because of a belief that some exempt material would be discussed. "(T)he Sunshine Act provides for an examination of each item of business to ascertain whether it may be closed under the terms of one of ten specific exemptions." Id. at 932 (citing Pacific Legal Foundation v. Council on Environmental Quality, 636 F.2d 1259, 1265 (D.C.Cir.1980)). At a bare, absolute minimum, the CAB should have opened the entire discussion of the DFW-London route, for the transcript reveals that no foreign policy concerns, arguably exempt, were discussed in connection with this route. We also have serious doubts, based on our examination of the full transcript (which the Board filed under seal after oral argument), that exempt foreign policy discussions so pervaded the debate on the Venezuelan route that the agency could not have segregated exempt and nonexempt portions, closing only the former.
 
 
 10
 Even if a portion of a * * * meeting may lawfully be closed because that part of the discussion is protected by a specific exemption, the (agency) may not close the entire meeting. * * * Congress declared that meetings should be opened to the fullest extent possible. * * * We therefore reject the Commission's contention that the Sunshine Act does not require an agency to segregate exempt discussions into a closed portion of its meeting. * * *
 
 
 11
 Common Cause v. NRC, supra, 674 F.2d at 936 n.46 (citing S.Rep.No.1178, 94th Cong., 2d Sess. 17 (1976) (conference report); S.Rep.No.354, 94th Cong., 1st Sess. 19 (1975); R. Berg & S. Klitzman, An Interpretive Guide to the Government in the Sunshine Act 30 (1978)). The Board's closure of its entire May 14 meeting was in patent violation of the law.
 
 
 12
 It is no excuse for the agency's unlawful action that no one asked the agency to hold an open meeting. Although the record before us reveals that the agency announced its intention to hold a closed meeting, we cannot determine from the present record whether the parties had actual notice of this intention before the meeting was held.[9] But much more important, the Sunshine Act speaks to agencies, not to the public. Section 552b(b) establishes a broad presumption that meetings shall be open, not a mere requirement that the Board accede to requests that it open its meeting. Section 552b(h)(1), moreover, dictates that when and if judicial review takes place the agency has the burden of sustaining its action to close a meeting. Congress has demanded that agencies open their decisionmaking processes to public scrutiny; no further demand is necessary.
 
 
 13
 The agency's unlawful closure of its May 14 meeting was no mere technical defect in this case. When judicial review and stays were sought the very next day, the petitioning airlines had no way of knowing the basis on which the agency had acted, and we were forced to decide whether the agency's action should take effect with only CAB counsel's post hoc explanation to guide us. Simple compliance with the Sunshine Act would have gone far to obviate this problem. With both a transcript of the May 14 meeting and the CAB's Order 82-5-145 now before us, we hold today that the agency acted reasonably. But the agency came perilously close, by unlawfully closing its meeting and offering no simultaneous explanation of its action, to forcing us to set aside its action, to the detriment of American, Continental, and the traveling public, none of whom had any complicity in the Board's illegal closure.
 
 
 14
 We wish to express in no uncertain terms our condemnation of the Board's failure to comply with the Sunshine Act. This failure, however, provides no basis for us to set aside the agency's action. Section 552b(h)(2), while it does not forbid us to vacate the CAB's order,[10] strongly indicates a congressional policy that release of transcripts, not invalidation of the agency's substantive action, shall be the normal remedy for Sunshine Act violations.[11] See also 5 U.S.C. § 552b(f)(2) (1976). See generally H.R.Rep.No.880 (pt. II), 94th Cong., 2d Sess. 10 (1976), U.S.Code Cong. & Admin.News 1976, pp. 2212, 2220 ("(n)othing in the section may be taken as the sole basis for invalidating the agency action involved in the meeting which is the subject of the litigation"). The House conference report sets out guidelines for when we should depart from the norm and invalidate agency action because of Sunshine Act violations:
 
 
 15
 The conferees do not intend the authority granted to the Federal courts by the first sentence of subsection (h)(2) to be employed to set aside agency action taken other than under section 552b solely because of a violation of section 552b in any case where the violation is unintentional and not prejudicial to the rights of any person participating in the review proceeding. Agency action should not be set aside for a violation of section 552b unless that violation is of a serious nature.
 
 
 16
 H.R.Rep.No.1441, 94th Cong., 2d Sess. 23 (1976).
 
 
 17
 We certainly consider the violation in this case to have been "of a serious nature," and as we have noted, it was at one time "prejudicial to the rights of * * * person(s) participating in the review proceeding." Release of the transcript of the May 14 meeting (of which we take full cognizance),[12] however, has removed the prejudice to the parties. Moreover, in the unique circumstances of this case, the violation may have been "unintentional," as that word was used by the conferees. The fact that no party asked the Board to open its meeting does not make closure any less a violation of the Act, but it does bear on the willfulness of the violation. We are chary, moreover, of visiting the sins of the CAB on the heads of American and Continental. So long as the Board's awards of temporary route authority to these two carriers were reasonable, we do not feel they should be vacated because they were reached in closed session.[13] We thus turn to a consideration of the reasonableness of these awards.
 
 III. Reasonableness
 
 18
 Our review of CAB carrier-selection decisions is guided by familiar considerations: "The present controversy is in an area into which courts are seldom justified in intruding. * * * (T)he selection of an awardee from among several qualified applicants is basically a matter of judgment, often difficult and delicate, entrusted by Congress to the administrative agency." Delta Air Lines, Inc. v. CAB, 564 F.2d 592, 596-597 (D.C.Cir.1977) (citing Frontier Air Lines, Inc. v. CAB, 439 F.2d 634, 641 (D.C.Cir.1971); Pinellas Broadcasting Co. v. FCC, 230 F.2d 204, 206 (D.C.Cir.), cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956)). We do not rubberstamp agency decisions, but we can hold them up against only a standard of reasonableness, not one of correctness or perfection. In this part we consider first the reasonableness of the CAB's procedures, second the Board's application of the criteria it used in this case, and third the reasonableness of using those criteria.
 
 A. Procedures
 
 19
 Section 1005(f) of the Federal Aviation Act, 49 U.S.C. § 1485(f) (1976), provides in full:
 
 
 20
 Every order of the Secretary of Transportation or the Board shall set forth the findings of fact upon which it is based, and shall be served upon the parties to the proceeding and the persons affected by such order.
 
 
 21
 Order 82-5-77, which awarded the exemptions, is an "order of * * * the Board" that does not "set forth the findings of fact upon which it is based," even in summary fashion. It is obvious, however, that the agency postponed announcement of its detailed rationale, not to frustrate the purposes of the Federal Aviation Act, but to further its general mandate to protect the public interest. At the behest of all the airlines that are parties to this case the agency acted as quickly as possibly to assure prompt resumption of service on Braniff's canceled routes and thereby minimize disruption to the traveling public.[14] "(T)he relative urgency of a decision is a thoroughly appropriate factor for an agency to consider when crafting its procedures." United States v. FCC, 652 F.2d 72, 96 (D.C.Cir.1980) (en banc ).[15]
 
 
 22
 Petitioners now argue that no real emergency of the magnitude assumed by the CAB existed, and that the Board did not consider adequately the possibility of waiting a few days before rendering its decision. We turn a deaf ear to these arguments. The CAB was certainly not unreasonable in assuming-without detailed, time-consuming evaluations of available alternative flights-that the parties' unanimous representation of an emergency requiring immediate action was correct.[16] Pan Am's application "request(ed) that it be authorized to commence service on Friday, May 14, 1982," the day of the CAB's meeting. Delta requested "immediate exemption authority" and stated its application was "for an emergency exemption without awaiting responsive pleadings." TWA likewise sought emergency exemption authority and, like Pan Am and Delta, knew that the CAB would hold a meeting (though not necessarily a closed one) on Friday afternoon but made no objection to the CAB's apparent intention to decide the case at that time.
 
 
 23
 Contrary to counsel's assertion at oral argument, the CAB did not "throw out due process." Its procedures were far from optimal, in that the carriers had no opportunity to respond to each other's applications.[17] But optimal procedures were not possible, and the CAB used procedures that were fair, giving each carrier a chance to file its application and take its one best shot.
 
 
 24
 We counsel agencies to be skeptical of parties' self-serving representations that a case requires immediate action. But short of a due process violation or an unreasonable acceptance of these representations, an agency commits no reversible error by acting immediately in these circumstances. In short, when the parties convince the Board that there is-or mislead the Board into reasonably thinking that there is-a need for immediate action, we will not hear those parties to complain that the Board acted immediately.
 
 B. Application of the CAB's Factors
 
 25
 The CAB relied on three factors in both the DFW-London and Central ZoneVenezuela exemption decisions: (1) duplication of Braniff's service;[18] (2) speedy institution of replacement service;[19] and (3) maintenance of the competitive market structure.[20] To the extent these are valid factors,[21] they favor the awards the CAB actually made.
 
 
 26
 American came by far the closest to offering service that would accommodate, on a single-carrier basis, the greatest number of Braniff passengers who might be using the DFW-London route. None of those passengers planned to take Braniff flights beyond London, for Braniff offered no such flights. Thus connecting service at London was irrelevant to this criterion. On the other hand, of all the American cities, only a limited number are "gateways," i.e., cities where international flights may make their first U.S. stop upon arrival or last U.S. stop upon departure. Passengers from nongateway cities thus must fly through gateways. Braniff had provided nonstop service to DFW from 33 cities; American serves 31 of these (and 29 additional cities), Delta serves 15 (and 16 additional), and Pan Am and TWA only one. Order 82-5-145 at 9-10. To the extent passengers had made plans to fly to London from other cities through DFW, selection of American disrupted the fewest plans. Similarly, Continental provides more nonstop flights into Houston (especially from Central Zone points, for which Central Zone gateways would be natural) than Pan Am, and provides nonstop flights from at least one important Central Zone city (Denver) to New Orleans, whereas Pan Am has no nonstop flights into New Orleans from the Central Zone. In contrast to the DFW-London situation, however, this factor was not overwhelmingly in Continental's favor, for the difference between points served into Houston is not great (Continental, 15; Pan Am, 13), and Pan Am actually serves more cities nonstop into New Orleans. Order 82-5-145 at 7.
 
 
 27
 The second factor, speedy replacement, is largely an irrelevancy with respect to DFW-London. Each carrier was ready to institute service almost immediately. American was a worse choice than Pan Am, Delta, and TWA on this criterion in the sense that it had no facilities in London and no approval from the British government, but American represented that it could obtain both in a matter of days. The CAB knew from experience that United Kingdom facilities and approval were easily obtained, see Transcript at 28, and American did in fact obtain both in time for its first DFW-London flight to take place within five days of its exemption. Continental's Venezuela application was also an inferior one based on this criterion alone, and the difference was much more severe. Acquisition of facilities at the Caracas and Maracaibo airports apparently was not a problem once Continental obtained Venezuelan government approval, but the Venezuelan government, apparently in keeping with past obstinance, took seven weeks to approve Continental. Thus this factor would strongly favor Pan Am, the only carrier with Venezuelan authority as of May 14.
 
 
 28
 An application of the third factor convincingly favors American over Pan Am and Delta for DFW-London. In the Transatlantic Route Proceeding, 75 CAB 616 (1978), the CAB had espoused the concept of intergateway competition. By assigning each of the three "southern-tier gateways" to London to a different carrier, the CAB had sought to ensure that travelers from London to the southern United States had the maximum number of carriers competing for their business.[22] In 1978 the CAB had assigned Houston to Pan Am, Atlanta to Delta, and Dallas to Braniff. If this structure was to be preserved, Pan Am and Delta could not replace Braniff in Dallas.
 
 
 29
 The third factor overwhelmingly favored Continental over Pan Am for the Venezuela routes. Before Braniff's demise only Braniff and Pan Am served Venezuela. Designation of Pan Am to replace Braniff would have given Pan Am a monopoly (among U.S.-flag carriers) on U.S.-Venezuela flights. This monopoly situation would endure for the length of the exemption authority and would have a potentially serious consequence beyond that time. The Venezuelan government has consistently sought to restrict the number of U.S.-flag carriers serving Venezuela, leading to at least one confrontation between the U.S. and Venezuelan governments.[23] Allowing a single-carrier situation to exist even temporarily could be seized on by Venezuela as a change in U.S. policy.
 
 
 30
 The three factors used by the CAB, then, seem overwhelmingly to favor American for DFW-London, because the first and third factors strongly favor American and the second only slightly disfavors American. With respect to Venezuela, the first factor slightly favors Continental, the second strongly disfavors Continental, and the third overwhelmingly favors Continental. Given the potential foreign policy consequences of an award to Pan Am, it was at least rational, and perhaps essential, for the CAB to choose Continental over Pan Am.
 
 C. Validity of the CAB's Factors
 
 31
 We assumed, in the last section, that the factors used by the CAB are valid. That assumption is assailed by petitioners. Pan Am argues, with respect to the first factor:
 
 
 32
 The Board provides no factual support for the proposition that the "behind gateway benefits" are significant to the traveling public. It is almost certain that an analysis would reveal that, in today's domestically deregulated environment, all of the points at which American would provide single carrier London service either already have such service from another carrier, or produce a de minimus (sic) amount of London traffic. However, there is no indication that the Board made such an analysis.
 
 
 33
 Brief for Pan Am at 52-53 (footnote omitted). There are at least two problems with this argument. First, Pan Am assumes that having available single-carrier service through, say, Boston or Houston completely obviates the need for having it available through Dallas as well, even though Braniff offered such service. This is not necessarily so. The CAB could legitimately seek, in the short term, to maintain single-carrier service to London through Dallas, not just when that is the only available service to London, but also when it competes with service through other cities. Second, Pan Am has provided no "analysis" of the type it mentions to either the CAB or this court. The CAB has used this factor in the past as indicative of the public interest, and Pan Am offers nothing but assertion to suggest it is invalid. "(W)hen the evidence of record does not fairly establish either a proposition or its contrary, the agency is within its sound discretion in adhering to what is knowable and avoiding what is necessarily in the domain of speculation." Trans World Airlines, Inc. v. CAB, 385 F.2d 648, 659 (D.C.Cir.1697), cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968). Quite recently this court reaffirmed this principle, noting its particular applicability when an agency was forced to act "in a restricted time frame on a limited record." Puerto Rico Maritime Shipping Authority v. FMC, 678 F.2d 327, 340 (D.C.Cir.1982).
 
 
 34
 In our judgment, it might have been irrational for the agency to abandon its intergateway-competition and connecting-service criteria in this truncated proceeding. Both criteria depend upon the assumption that passengers will sometimes choose to fly out of the country from various cities through DFW, Houston, or New Orleans. Substantial arguments could be made-though the parties have not made them[24]-that this is an unrealistic assumption. Certainly a glance at the globe indicates that DFW is a natural gateway between few American cities and London. But this assumption underlay the CAB's adoption of the intergateway-competition policy in its major decision in Transatlantic Route Proceeding, supra, 75 CAB 616. The Board should not abandon such a crucial assumption, under which it had operated for four years, on the spur of the moment. Intergateway competition may prove, upon reexamination during the certificate proceeding, to be a chimera. But in the proceeding under review here and now, the Board quite properly sought to preserve the competitive status quo-three carriers serving London from southern-tier gateways and two carriers serving Venezuela-in the short term. Likewise, it was rational for the Board to try to ensure that the carrier selected would and could honor tickets held by Braniff passengers, whether few or many, flying from other cities to London through Dallas.
 
 
 35
 Not until the rebuttal portion of oral argument in this court did a petitioner (Pan Am) cite any source against which the CAB's assumption could be checked. Even if that source, a CAB route survey, showed that no passengers had flown from other cities to London through DFW on Braniff flights, we would consider it a poor basis on which to reverse the Board, for Pan Am's argument amounts to this: The Board should have, sua sponte, in a few hours' time, realized the invalidity of a four-year-old assumption, although neither Pan Am nor the other petitioners, in the month they were given to brief this case, even thought to marshal evidence to rebut that assumption.[25]
 
 
 36
 Pan Am also argues that the third criterion has been arbitrarily applied. While grounding its selection of American for DFW-London largely in "competitive" concerns, the CAB explicitly deferred until a long-term case evaluation of the anticompetitive effect of increasing American's dominance at DFW, on the ground that "(t)his issue cannot be adequately evaluated until the situation has stabilized * * *." Order 82-5-145 at 10 n. 25. Pan Am asserts that it is arbitrary to consider intergateway competition but not competition within DFW, and there is certainly a facial inconsistency. But Pan Am points to no past case in which the Board has addressed the possible anticompetitive impact of awarding a carrier an international route originating at a gateway it already dominates. The question was novel and complex, involving issues of both market definition and excessive market share. It was quite proper to defer this question until it could be explored in some depth. The CAB's intergateway-competition policy, on the other hand, was already established as a result of a lengthy proceeding, and its application is simple: three different carriers should serve the three southern-tier gateways.
 
 
 37
 Pan Am, citing Pillai v. CAB, 485 F.2d 1018 (D.C.Cir.1973), has also called into question the Board's reliance on foreign policy concerns to select Continental. In Pillai we said: "The Board cannot wrap its decision in some mystique of foreign policy or purported expertise in international negotiation to achieve a nonreviewable status for the facts underlying its most important sensitive decisions." Id. at 1023. The present case differs from Pillai. The Board relies here not on any "mystique of foreign policy," but on an understandable fear based on specific past events, see note 23 supra. That fear was that the Venezuelan government would, if Pan Am were designated for interim authority, block the possible later designation of a second carrier for certificate authority, even though the United States may designate a second carrier under the bilateral treaty. The Venezuelan government has in the past balked at increases in the number of U.S. carriers designated to fly to Venezuela, even though the increases were permissible under the treaty. See note 23 supra. This contrasts sharply with Pillai, where "(w)e (were) not cited to anything in the history of airline negotiations to support the idea that (action the CAB had declined to take) would necessarily produce an unresolvable confrontation with a foreign country." 485 F.2d at 1024. See also note 36 infra.
 
 
 38
 We thus reject each of petitioners' specific attacks on the validity of the factors the Board used. There remains a more generic attack on which petitioners place heavy reliance. They argue that the Board improperly used factors considered important in past long-term certificate cases, whereas this was a short-term exemption case. The CAB does not, for it cannot,[26] dispute that the intergateway-competition and connecting-service criteria are derived from past certificate cases, but it contends they are valid short-term criteria nonetheless. The difference between the parties, therefore, depends on a logically necessary but unstated premise of each argument: petitioners assert that long- and short-term criteria are mutually exclusive; the CAB asserts that they are not, and that long-term criteria may well be short-term criteria as well in an appropriate case.[27]
 
 
 39
 We agree with the CAB. Certainly the statutory standards for granting certificates, see 49 U.S.C.A. § 1371(d)(1) (1982 Pocket Part) ("consistent with the public convenience and necessity"), are not at odds with the standards for granting exemptions, see 49 U.S.C. § 1386(b)(1) (Supp.III 1979) ("consistent with the public interest"). As a general proposition, factors relevant to the public convenience and necessity in the long term will be relevant to the public interest in the short term. Of course, not all long-term factors can be adequately evaluated in a truncated proceeding. But when the CAB has already established that certain things, such as connecting strength and intergateway competition, serve the "public convenience and necessity," those factors can be evaluated relatively easily and should be appropriately considered in determining the public interest.
 
 
 40
 Petitioners seek support for their position in some language about "prejudgment" in our decision in Kodiak Airways, Inc. v. CAB, 447 F.2d 341 (D.C.Cir.1971). This reliance on Kodiak is misplaced. In that case there was substantial cause for concern that the Board had actually awarded permanent certificate authority under the guise of temporary exemption authority.[28] Permanent certificate authority may be awarded only in keeping with the extensive procedural requirements of 49 U.S.C.A. § 1371 (1976 & 1982 Pocket Part).[29] In this case there is little cause for concern that the Board is actually awarding certificates.[30] Indeed, it would be an astoundingly cavalier act for the Board to do so in the short time and on the scanty record available to it in this case. We do not believe that this has occurred.
 
 
 41
 A useful parallel may be drawn between the CAB's awards of interim authority and this court's awards of interim relief from a lower tribunal's decision. We consider such interim factors as irreparable injury to the movant and harm to other parties resulting from our decision. But we also consider likelihood of success on the merits, i.e., the factors that will guide our eventual, permanent determination. Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam). Even when the interim factors are strongly compelling in one direction, our cases not only permit but require us to consider the merits, at least to the extent of determining if "a serious legal question is presented." Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C.Cir.1977). This does not in any meaningful sense prejudice our later consideration of the merits. We, like the members of the CAB, are mortal. See Kodiak Airways, Inc. v. CAB, supra, 447 F.2d at 345. But our mortality hardly prevents us from reconsidering, in an appropriately deliberative proceeding, a rough, preliminary assessment of the merits. Neither has the CAB in any way bound itself, as either a practical or a legal matter, to its preliminary assessment of the public interest.
 
 
 42
 We exhort the Board to, and are confident that it will, thoroughly reexamine every criterion it has used in past certification cases for these routes. If some of those criteria are no longer (or never were) valid indicia of the public convenience and necessity, they should be abandoned. Consideration of some of those criteria in making the short-term award in this case will not prejudice the long-term award, for it would be nonsensical for the Board to conduct a certificate proceeding for several months yet wed itself to previous interpretations of the public interest reached in a few hours' deliberation.[31] Kodiak requires us only to recognize that the members of the CAB are "mortal" men and women, 447 F.2d at 345 (quoting Community Broadcasting Co. v. FCC, 274 F.2d 753, 759 (D.C.Cir.1960)); it does not require us to consider them foolish.
 
 IV. Investments in the New Routes
 
 43
 In Part III we discussed the reasonableness of the Board's procedures, its application of certain factors, and the validity of those factors. We now must determine whether the Board adequately considered a factor that cuts against its decision: American and Continental, unlike petitioners, had no facilities or operations in London and Venezuela, respectively. Petitioners contend that American and Continental would have to make substantial investments to start operations at these points, and that these investments will bias the CAB in favor of selecting American and Continental for certificate authority. Thus, they argue, the CAB was required to choose from among them so as to minimize this prejudice. Once again they rely on Kodiak Airways, Inc. v. CAB, supra.
 
 In Kodiak we said:
 
 44
 The question presented * * * is whether the Board's findings in its Orders 70-1-113 and 70-8-35 indicate that it adequately considered the possibility of prejudice under Ashbacker (Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945),) and concluded that this possibility was outweighed by the improved service which Wien would allegedly provide. * * *
 
 
 45
 447 F.2d at 350-351 (footnote omitted). Kodiak thus establishes no presumption that "the possibility of prejudice" is to be the decisive decisional factor; it instead must be "adequately considered" and may be outweighed by other public-interest factors.
 
 
 46
 In two cases the Board appears to have attached decisive significance in making interim awards to the presence of a carrier at both ends of an international route. Houston-Acapulco Route Proceeding, Order 82-4-118 (CAB April 21, 1982); Florida-Mexico City Investigation, Order 78-6-59 (CAB June 21, 1978). The Board's attempt to distinguish these cases, Order 82-5-145 at 13 n. 36, is not altogether satisfactory. In Houston-Acapulco the Board said, "(W)e had before us several proposals and acknowledged that arguments might be made for each." Order 82-4-118 at 4. In the present case, however, the Board contends that in Houston-Acapulco it faced "an 'all other things being equal' situation * * *." Order 82-5-145 at 13 n. 36. The "arguments might be made" standard encompasses far more cases than the "all other things being equal" standard. Moreover, the Board was aware at its May 14 meeting that it was departing from precedent somewhat. See Transcript at 28.
 
 
 47
 We decline to hold the Board to any wooden rule it may have followed in the past of awarding exemptions to carriers present at both ends of the route. To the extent the Board has followed any such rule in the past, it has, as noted above, read Kodiak too broadly. There is Board precedent, moreover, for the proposition that minimal or retrievable investments cause so little prejudice that other public-interest factors may overcome them with relative ease.[32]
 
 
 48
 The Board "adequately considered the possibility of prejudice under Ashbacker and concluded that this possibility was outweighed * * *." Kodiak Airways, Inc. v. CAB, supra, 447 F.2d at 350-351. American informed the Board that it had "sufficient B-747 aircraft in its fleet for operating" the DFW-London route. Supplemental Application of American at 4 n. 2 (May 14, 1982). It also represented that it "anticipate(d) taking over Braniff's gate and terminal space at Gatwick Airport with minimal start-up expense." Id. at 7. American could and did enter into agreements, generally terminable on 30 days' notice, providing for all aspects of operation of the route. Affidavit of Wesley G. Kaldahl, paragraph 2 (May 17, 1982). The case is, in this respect, on all fours with Kodiak:
 
 
 49
 (Petitioner) argues that the Board's finding that Wien would not have to spend substantial amounts to operate the route in question on a temporary basis was incorrect. We find this argument to be without merit, however. Wien had planes on hand which it could use on the route and its agreement with Western obviated the need to purchase ground facilities outright. Wien may have some difficulties disposing of employees if it is not successful in the certification proceedings, but these difficulties are not sufficient in themselves to suggest that the decision as to certification will be influenced by the grant of temporary authority.
 
 447 F.2d at 351 (emphasis added).[33]
 
 50
 The CAB was on solid ground in determining that American's startup costs would be quickly retrievable, so as not to prejudice a certification case a few months later. American had forecast "revenues of over $76,000,000 and an operating profit of $7,600,000" on a yearly basis. Order 82-5-145 at 13 n.35. Petitioners argue at length that American's startup costs would be one or two million dollars, rather than the few hundred thousand dollars the CAB may have assumed, see Transcript at 30.[34] But even if American expended $1.9 million in startup costs, so long as its operating profit was half of what it projected (i.e., $3.8 million/year), it would take only six months for American to recover its startup costs. Thereafter there would be no unrecovered startup costs and no basis for the CAB to consider, even unconsciously, the possibility that American should be kept in place so as not to have its investment wasted. Of course, if the route proved to be unprofitable for American, as it had for Braniff, the situation might be different.[35] But the eagerness with which major airlines sought authority for this route suggests that "the market" thought the route a potential moneymaker.
 
 
 51
 The interaction of public-interest and prejudice factors is somewhat different with respect to Continental.
 
 
 52
 While (Continental) does not yet have stations in Venezuela, only Pan American among the applicants does, and we have already described the economic, competitive and foreign policy reasons that argue against our selecting Pan American for temporary exemption authority in this case. Aside from Pan American, no carrier could plausibly claim that it would incur significantly lower start-up costs than Continental.
 
 
 53
 Order 82-5-145 at 13. By the last sentence the CAB implicitly acknowledged that Pan Am would have significantly lower startup costs than Continental. But the CAB attached overriding significance to the desire not to reduce Venezuela to a single-carrier market, with possible attendant foreign policy consequences. The CAB was dealing with large weights on each side of the balance in this instance; it does not appear that it compared them irrationally.[36]
 
 V. Duration of the Awards
 
 54
 The starting point for inquiry into the rationality of the CAB's eleven-month awards must be Northwest Airlines, Inc. v. CAB, 539 F.2d 748 (D.C.Cir.1977) (per curiam ). In that case we said with respect to exemption authority:
 
 
 55
 Temporary relief of this kind must * * * be limited to no more than is necessary to meet the crisis. * * *
 
 
 56
 The Board's action in this case, leaving the temporary changes in place for up to two years without any opportunity for opposing parties to present their objections at an evidentiary hearing, went too far. The temporary changes should have been implemented only until such time as the Board could complete narrowly focused, expedited proceedings * * * on permanent changes in certificate authority. * * * And the Board should assign sufficient personnel to guarantee speedy consideration. (This was, after all, an emergency, at least in the eyes of the Board and the two carriers.) * * *
 
 
 57
 Id. at 752. The court proceeded to invalidate the exemption because it had already gone on for 17 months, which was unreasonably long "as an interim response to emergency conditions." Id. at 753.
 
 
 58
 It seems obvious that this decision inescapably invalidates an eleven-month award in response to an emergency requiring decision in one day. The CAB, however, asserts that Northwest is distinguishable: "Here * * * the exemptions at issue will terminate within eleven months (as opposed to 17), and the Board in the meantime will hold proceedings to determine which carriers should be granted the certificate authority." Brief for respondent at 36. Yet no certificate proceeding has yet begun or even been scheduled, despite the filing of applications for certificate authority on these routes. And while Northwest involved a longer exemption period than this case, it certainly does not stand for the proposition that all exemptions of less than 17 months' duration are valid.
 
 
 59
 The CAB states: "Typically the Board will grant an interim exemption for a year or until a Board decision in a route case." Brief for respondent at 35. Rather than demonstrating the soundness of the CAB's action, this shows its irrationality. If a year's interim authority is typical, the Northwest mandate that relief "be limited to no more than is necessary to meet the crisis" strongly suggests that a shorter period than a year is required in an emergency situation like this one.
 
 
 60
 The factors the CAB cites as supporting its eleven-month awards make no sense. In Order 82-5-145 at 14, in the CAB's brief at 35, and in the intervenors' briefs, the statement that carriers must have time "to stabilize their operations" is quoted but not elaborated. What does "stabilize" mean? This statement could as easily be made in support of a six-month award or a six-year award. The interests of applicants for certificate authority certainly do not require that American and Continental operate for an eleven-month interim when, as Pan Am demonstrates, brief for Pan Am at 60 n.38, complex certification proceedings can be completed in six months or less.[37] And the CAB's solicitude for Braniff's reorganization efforts is curious, when it was Braniff's abandonment of the routes that led to the crisis. Even if this last factor is valid, it suggests only that certificate proceedings should not be completed in the three or four months it should take Braniff to reorganize. It is no reason why they should not be begun. We therefore order the Board to begin certification cases on these routes as immediately as possible, and to complete them within six months from the date of this opinion.[38]
 
 VI. Conclusion
 
 61
 Two decades ago this court was presented with another case involving the financial extremis of a major airline. We noted:It is very well to theorize in hindsight about possibilities; but a regulatory agency must sometimes deal with immediate crises upon a realistic judgment of the moment. To be sure, it cannot be excused for mistakes thus made; but the area of permissible discretion can be measured in terms of the situation then existing.
 
 
 62
 Northwest Airlines, Inc. v. CAB, 303 F.2d 395, 398 (D.C.Cir.1962). Giving the agency the appropriate latitude, we find that "the decision was based on a consideration of the relevant factors" and was not "a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Our limited judicial role thus requires us to affirm.
 
 
 63
 We have forgiven some shortcomings in the Board's decision because of the extra deference due an agency responding to an emergency situation. It would be incongruous for us to afford the Board similar deference when considering the duration of the authority it has awarded. Instead, the emergency situation counsels that relief "be limited to no more than is necessary to meet the crisis." Northwest Airlines, Inc. v. CAB, supra, 539 F.2d at 752. Eleven months, just short of the Board's "typical" award of interim authority, is too long in this crisis situation. We therefore order the Board to complete certificate proceedings within the timeframes set out in this opinion.
 
 
 64
 So ordered.*
 
 WILKEY, Circuit Judge, dissenting:
 
 65
 I do not know which of these outstanding American-flag air carriers should have been awarded the routes in controversy here, nor which should be preferred for permanent certificate authority; but on the record in this case neither does-or could-the Board know. The Board's action does violence to the most fundamental procedural and substantive principles of administrative law, and the result stemming from such a process is highly suspect.
 
 
 66
 The Board announced (and now reiterates in argument) that it was seeking to place a carrier on each of Braniff's international routes which could move swiftly and effectively to take care of already ticketed Braniff passengers and maintain the American-flag position. What the Board in fact proceeded to do was the following:
 
 
 67
 1. To select for the Dallas/Fort Worth (D/FW)-London route the airline of the four serious contenders which was least prepared to serve London-the airline with only 9 employees in London, compared to 1,039, 468, and 51 employees for the other three applicants; the only one of the four without a station at either Heathrow or Gatwick airports; the only one of the four with no flights to, and hence no experience serving, any country in Europe.
 
 
 68
 2. To select as a carrier to Venezuela the only airline of the serious contenders with no flights to Venezuela, no employees there, and, in fact, no flights or employees anywhere in South America. In other words, for the Venezuela as well as the London route the Board chose the least prepared carrier.
 
 
 69
 3. To select a carrier on each of these routes based on criteria properly relevant only to the award of permanent authority, criteria whose present consideration will necessarily prejudice the ultimate certification proceeding, and to do this despite a previously demonstrated understanding of, and adherence to, the difference between long- and short-term selection factors.
 
 
 70
 4. To rely in the choice on permanent certificate criteria without first developing even the semblance of an adequate factual base, ignoring the complexity of the permanent issues and the due process rights of the applicants to present to the Board facts relevant to certification at a hearing following due notice.
 
 
 71
 5. To do all this in a meeting held without specific notice and closed to the public, resulting in a skeleton order reciting neither findings nor reasons for the conclusions reached and, thus, keeping the true rationales (as reflected in the transcript of the meeting) secret until compelled to disclose them by a Freedom of Information Act request.
 
 
 72
 If the above actions are sustainable as proper under the Administrative Procedure Act and the specific statute of the agency involved here, then any agency should be able to meet this lackadaisical standard anytime. If such actions are sustainable, then obviously there is little need or purpose for judicial review of agency action; we can abolish judicial review totally and thus remove a very large burden from the federal courts. To see why the Board's action cannot be sustained under accepted legal principles, let us first look at the statutory framework and emergency situation within which the Board acted, then examine the procedural path on which the Board went astray, and, finally, analyze the factual basis-totally inadequate for decision under any procedure-on which the Board acted.
 
 
 73
 I. Statutory Framework and Emergency Situation
 
 
 74
 No air carrier may provide service on a route unless certified by the CAB.[1] The CAB may, however, exempt a carrier from this requirement "if it finds that the exemption is consistent with the public interest."[2] Pursuant to this authority, the CAB has promulgated various regulations governing applications for exemption orders, including specifications for the contents of the application and the time periods allowed for answers and replies.[3] An expedited process, with truncated filings, is allowed for in "emergency" situations.[4]
 
 
 75
 The purpose of an exemption is to ensure that the public is adequately served during the pendency of what are often lengthy certification proceedings. When the needs of the public are especially urgent an emergency exemption is appropriate, for even an exemption proceeding takes at least seventeen days for the filing of answers and replies.
 
 
 76
 The CAB's determination that Braniff's financial collapse gave rise to such an emergency was not unreasonable. In addition to its extensive domestic network, Braniff flew three international routes out of D/FW-one to Mexico, one to London, and one, via Houston and New Orleans (the Central Zone), to Venezuela. Thus, when Braniff filed for bankruptcy on 13 May 1982, the travel plans of thousands of passengers were disrupted. Because of deregulation of the airline industry generally, those passengers scheduled on Braniff's domestic routes were speedily accommodated by other airlines. But the problems faced by Braniff's international passengers were more acute. Numerous treaties limit U. S. carrier service to and from foreign countries. Only one U. S. carrier is allowed to fly directly from D/FW to London or to Mexico City, or from the Central Zone to Venezuela. Braniff passengers on those routes were forced to switch either to foreign airlines providing direct service or to less convenient one-stop or connecting U. S.-flag service. Passengers lost time and money. In addition, U. S. trade was lost to foreign carriers.
 
 
 77
 The Board's decision to respond swiftly to this dilemma was supported by the applications of the various airlines seeking exemption authority. The petitioners in this case, Delta, Pan Am, and TWA, all stressed the need for an immediate decision.[5] The CAB announced that it planned to meet-and presumably award the exemptions-on the afternoon of the day it received the applications. None of the airlines objected. None requested more time to file answers and replies. In light of these facts, I agree with the majority that the Board could properly hold emergency proceedings.
 
 
 78
 But to find that the Board was not required to follow its time-table for answers and replies does not end our inquiry. An emergency situation gives the Board considerable discretion in tailoring its procedures to meet the needs of the public.[6] But the procedures upon which it fixes must still be fair to all the applicants. This is a fundamental tenet of administrative law.[7] Furthermore, the Board is limited in the factors it can consider in making its decision. An emergency exemption hearing cannot be treated like a mini-certification proceeding. Finally, the Board must develop an adequate factual basis for its decision. The emergency situation allows (even requires) the Board to limit the factors it considers. But where a consideration is crucial to the Board's decision it must be supported by substantial evidence regardless of the time pressures.[8] Otherwise, the Board might as well be flipping a coin or, even worse, acting out of personal bias.
 
 
 79
 The CAB simply failed to satisfy its responsibilities in this case. As explained in the majority's per curiam opinion, the Board's 14 May meeting was closed to the public in violation of the Sunshine Act. The Board's order awarding the temporary exemptions was then issued without any accompanying statement of reasons and findings. The Board did not even release a transcript of the meeting (after redacting any sensitive foreign policy remarks) contemporaneously with the order so as to give the applicants at least some inkling of the reasoning behind the Board's decision. The transcript was only released subsequently under compulsion of a FOIA request.
 
 
 80
 These procedural defects are compounded by the Board's reliance in its 14 May meeting on decisional factors inappropriate to the award of an emergency exemption, factors that are properly considered only in a certification proceeding. The danger posed by such reliance is not only that the Board is prejudging its long-term award and will not approach the certification proceeding with an open mind, but also that it is making a long-term decision, or at least a short-term decision based on long-term factors, without adequate time to develop a factual basis for that decision. The factors the Board has traditionally relied on to make a short-term award are easy to calculate. Long-term certification factors, on the other hand, are far more complex and their proper consideration can only take place within the time-consuming procedural safeguards of the certification process.
 
 
 81
 Given that the Board made long-term certification factors dispositive in this case, and given the excessive duration of the exemption award (all out of proportion to the demands of any emergency), it is my view that the Board should be held to the procedural requirements of the certification proceeding in which it actually engaged. Those requirements are obviously not met here. The inadequate notice, the lack of opportunity for answers and replies, the closed hearing, and the initial skeleton order-all these add up to a denial of due process. This case should be remanded to the CAB with instructions either to hold an exemption proceeding, at which only those factors appropriate to an exemption are considered, or to hold a full-fledged, procedurally proper certification hearing. The Board cannot combine the truncated procedures of the first with the complex analysis of the second.
 
 
 82
 The inadequacy of the factual basis for the Board's decision forms an independent ground for a remand. A court owes deference to the Board's expertise in interpreting and drawing conclusions from facts relevant to carrier selection.[9] But the Board must first have before it the basic facts to which it can apply its expertise.[10] Little deference is owed to pure speculation, and a court eschews its responsibility for review if it allows an agency to make decisions based on criteria about which it has inadequate information.
 
 II. Procedural Due Process
 
 83
 Section 1005(f) of the Federal Aviation Act provides in full:
 
 
 84
 Every order of the Secretary of Transportation or the Board shall set forth the findings of fact upon which it is based, and shall be served upon the parties to the proceeding and the persons affected by such order.[11]
 
 
 85
 The preparation of such a statement of reasons and findings should play an integral part in the decisionmaking process. Even if it is prepared by staff members after the Board has made its decision, the statement is likely to be scrutinized by the Board members themselves before it is issued. And as long as the decision has not already been announced it is freely changeable if Board members are dissatisfied with the statement. Perhaps more important, in the process of preparing the statement a staff member may become aware of unforeseen difficulties with the decision, with the result that individual Board members change their votes. But if the decision is announced prior to the preparation of the statement the process is no longer one of investigation. There is an overwhelming institutional bias in favor of justifying the result in any way possible. Post hoc rationalizations, such as those contained in the Board's 27 May order, are not part of the decisionmaking process, and it is that process which the court is charged with safeguarding.
 
 
 86
 The CAB attempts to justify its failure to provide a contemporaneous statement of findings and reasons by pointing to the time pressures caused by Braniff's unexpected collapse. But although these time pressures excused the Board from abiding by its usual exemption schedule, they did not eliminate so fundamental a requirement as a contemporaneous justification published with the order. In American Smelting and Refining Co. v. Federal Power Comm'n, this court stated unequivocally that "an interim order ... must include a statement of reasons based upon findings of fact which are supported by substantial evidence in the record. No emergency can excuse these procedural requirements."[12]
 
 
 87
 The Board has shown in the past that it can quickly prepare an acceptable statement when circumstances so require. When an Eastern/Braniff route exchange application was filed on 26 April at approximately 5:00 p. m., the Board met, considered and approved the route exchange by 10:00 p. m. the same evening. A seven-page order setting forth the Board's reasoning was posted at 7:24 p. m. the following day.[13]
 
 
 88
 Assuming the Board had a clear grasp of the reasons for its decision (certainly a requirement of rational decisionmaking), a brief order giving those reasons could easily have been prepared within a day. And, as the transcript of the Board's 14 May meeting reveals, no greater haste appears to have been necessary. When asked how quickly the Board needed to act, a senior staff member noted that "as between Friday and Monday or Tuesday or Wednesday of next week, there is no urgency, no great urgency now that could not be satisfied early next week on any of these applications."[14] In fact, the staff saw so little need for haste that it originally prepared an order asking for public comments on the various applications.[15] Moreover, two members of the Board expressed their own doubts as to the need for immediate action.[16] The only response made to those doubts was an appeal to public relations by Chairman McKinnon.
 
 
 89
 I think we ought to try to make an effort (to decide today). Number one, I think here is an opportunity for CAB to shine again by showing decisive action, showing the government is interested and does care and does respond to the crisis and emergency quickly.[17]
 
 
 90
 No attempt was made to consider in detail the availability of alternative service on the abandoned routes or the true needs of the public before deciding to issue a bare-bones order accompanied only by the conclusory statements that an emergency existed and that the awards were consistent with the public interest. Neither the wish to appear decisive nor the clamour of the airlines for prompt action can excuse this fundamental procedural defect.
 
 
 91
 The Board's failure to prepare a contemporaneous statement of reasons and findings might be somewhat alleviated if the court could at least be sure that the Board considered only relevant factors and made a reasonable decision based on the information before it. But such assurances have not been forthcoming. Indeed, the opposite appears to be the case. The transcript of the 14 May meeting[18] reveals that the Board focused its attention largely on long-term certificate factors about which it had little solid information.
 
 
 92
 The inadequacy of the factual basis is important. If the Board really had before it a sound factual predicate on which it acted, the court might be justified in noting but excusing the procedural violations in the confidence that no harm was done to other applicants' rights. But this was not the case. Part III, infra, demonstrates that the Board's factual foundation for considering long-term factors was a gossamer of speculation allegedly illuminated by the ever-present remote glow of "expertise." All of this could have been shattered by factual presentations of the parties, if they had had the opportunity to do so. This illustrates that the legitimate options open to the Board were, either to stick with relevant interim authority criteria only, or to take time and follow the prescribed procedure to get evidence relevant to permanent certificate authority. The Board did neither, but engaged in an illegitimate de facto permanent certificate authority proceeding.
 
 
 93
 The 14 May meeting began properly enough. In awarding Eastern a temporary exemption for the D/FW-Mexico route, the Board followed both judicial and CAB precedent. It relied upon the doctrine first developed in Kodiak Airways, Inc. v. CAB,[19] and refined in subsequent agency proceedings, that in awarding a temporary exemption the CAB is not supposed to prejudge its long-term carrier selection. The exemption is to be awarded solely on the basis of the short-term public interest and in a way that does not prejudice the Board's ultimate choice.
 
 
 94
 Kodiak itself relied upon Ashbacker Radio Corp. v. FCC,[20] in which the Supreme Court established a general right to fair comparative consideration of competing applications before an agency. In Kodiak this court applied that right to exemption applications before the CAB. We stressed that the avoidance of possible prejudice to the later certification proceedings "is clearly a major factor to be considered in determining the public interest."[21] Hitherto, the Board has followed that mandate by confining its consideration to short-term factors (in particular, the relative ease and lack of expense with which a carrier could provide service during the pendency of the proceeding), while leaving long-term considerations (such as competitive market structure) to the certification hearing.
 
 
 95
 Thus, in considering exemption applications for a Florida-Mexico route in 1978 the Board stressed:
 
 
 96
 (W)e must reach a decision based on short-term factors which will leave us with the maximum flexibility to decide the long-term issues in the route proceedings. National does not serve Mexico and would have to open two stations there and train personnel to staff them. While we do not believe that this would necessarily require a very large, irretrievable commitment of resources, it argues against a temporary award to that carrier.[22]
 
 
 97
 Other applicants were rejected for the same reason, and the CAB settled on Eastern because "Eastern already has significant historic participation and operates at three of the points, so its selection for temporary authority is least likely to have an influence, however unconscious, on the ultimate selection of a carrier in the route proceeding."[23]
 
 
 98
 Similarly, as a second example, just a few weeks before the order in question here, Eastern was granted exemption authority on Braniff's abandoned Houston-Mexico route for the simple reason that it had stations at both ends, making it easy and inexpensive to institute temporary replacement service. None of the other applicants met that test.
 
 
 99
 While we are interested in maximizing the public benefits in the market, these are precisely the types of issues best addressed in the certificate case. Meanwhile, the record in this case demonstrates that the public interest will be served most effectively by granting Eastern temporary authority because it can promptly institute and maintain service pending the outcome of the certificate case and because its selection will provide us with maximum flexibility in deciding which carrier should be awarded Houston-Acapulco certificate authority.[24]
 
 
 100
 A third-and most recent-example of proper Board rationale is found in this very proceeding. These same concerns were noted by the Board when it awarded the D/FW-Mexico route to Eastern early in its 14 May meeting.
 
 
 101
 Capitol has no stations either in Dallas or Mexico City or Acapulco. This would be an entirely new operation for them.
 
 
 102
 Historically, at least, the Board has tended to look at carriers for interim authority who would not need to make large or significant front end expenditures to get into the market.[25]
 
 
 103
 Thus, Eastern was chosen despite the fact that it already had an interim exemption on the competing Houston-Mexico route (which indicates that the Board "policy" of competing "gateways," discussed more fully infra, can-and should-be of little importance in an emergency interim authority situation).
 
 
 104
 MR. KASPER: ... Eastern holds a lot of Mexican authority and we have been trying to diversify the carriers so that we get gateway competition. So, Eastern-one of the factors to consider in the long term case is whether the Board wants to give Eastern another gateway at a point which is not its major hub in terms of strengthening competition to Mexico.
 
 
 105
 We are really not trying to address that long term issue at all.
 
 
 106
 MR. MELLUPS: We did give Eastern the Houston/Acapulco route when it came open just a few weeks ago basically on the same rationale. It was a short term basis. In fact, a lot of the considerations that the Board would consider on a long term basis were argued against Eastern potentially.
 
 
 107
 MR. ROSENOW: For present purpose, Eastern is there, ready to go and it meets the criteria-[26]
 
 
 108
 In awarding exemptions for the London and Venezuela routes, however, the Board abruptly changed its criteria. A representative of the Bureau of International Aviation opened the London discussion by noting that "(i)n terms of the standard, and I say the standard, not necessarily unbending but standard way in which the Board has looked at granting exemptions, it looks at carriers again that would not have to make a significant investment to provide the service on an interim basis."[27] He then explained that three of the applicants, the three petitioners in this case, had stations at both ends of the route whereas others had none or, like American, only one.
 
 
 109
 At this point, Acting General Counsel Mellups interposed.
 
 
 110
 At the risk of sounding like a heretic, I have thought that maybe the stations at both ends selection criteria is a bit of-is a bit overdrawn, and I think the Board can very validly take account of overriding circumstances and considerations where that factor just sort of drops by the wayside.[28]
 
 
 111
 The focus of the discussion then totally changed. After a brief protest by one member,[29] the factor of how easy and inexpensive it would be for a carrier to commence interim service comparable to that abandoned, a factor which precedent established as the Board's dispositive short-term consideration, did "just sort of drop( ) by the wayside." In its place arose two long-term factors, feed and market structure, which the Board's own staff classifies as "Traditional Long-Term Selection Factors."[30] American was chosen for the D/FW-London route, first, because its strong position at D/FW would make it able to funnel domestic traffic through D/FW to London,[31] and, second, because it would provide intergateway competition with Pan Am's Houston-London route and Delta's Atlanta-London route.[32] Similarly, Continental was awarded the Central Zone-Venezuela route because of its strong domestic network[33] and because of the Board's desire to give Pan Am intergateway competition to Venezuela.[34]
 
 
 112
 In other words, the Board made its interim exemption orders based on the same factors that led it to certify Braniff for the routes originally.[35] And, in the name of intergateway competition, the standard short-term selection factor, stations at both ends of the route, became a drawback rather than an advantage.
 
 
 113
 Throughout the meeting, Board members showed their awareness that they were relying on long-term selection factors.
 
 
 114
 MS. BAILEY: But that is speaking more to the long-term than toward the short-term.
 
 
 115
 MS. SCHAEFFER: Yes, but I am talking about it in terms of-I cannot help but think that when we choose a carrier for the short-term, there is certainly quite frankly a certain bias that does exist in favor of that. We are trying to make the best choice for the short-term. And hopefully if we are right, it will become the long-term.
 
 
 116
 MR. LACHTER: It certainly is easier. Because the best choice in the short-term tends to be the best choice in the long-term.
 
 
 117
 MS. BAILEY: But that is not always the case.
 
 
 118
 MR. DALLEY: Since the Board is merging the two, it does not matter very much.[36]
 
 
 119
 Staff members also recognized that this reliance was improper and proposed to disguise it in the order subsequently prepared.
 
 
 120
 MR. KASPER: Some of these movements are long run considerations which we'll stay away from in the order. But we can hang our-if the Board wants to go with American, we can hang our hat on the fact that you have a couple of extra seats a day.[37]
 
 
 121
 The consequence of these improper considerations was that, of the serious contenders, the Board chose the least rather than the most prepared carrier, requiring the greatest rather than the smallest interim investment, on each of these routes. In short, the Board violated all its fundamental principles applicable to awarding interim authority, principles which it had recently recognized in the Florida-Mexico route, in the Houston-Mexico route, and in the D/FW-Mexico route awarded in this very proceeding. Worse still, the Board did this "merging the two" (interim and permanent) in order to pick the carriers it will ultimately certify for permanent authority, thus violating the Kodiak doctrine and Ashbacker (on which Kodiak rests).
 
 
 122
 Pan Am, Delta and TWA already operate from both Dallas and London. Pan Am has 1,039 employees in England, TWA has 468, and Delta has 51. American had only 9, none of whom were at either London airport. Pan Am operates in both the Central Zone and Venezuela. Pan Am had 377 employees in Venezuela; Continental had none. Nor did Continental have operating experience anywhere in South America. Start-up costs for any of the airlines not selected would be minimal. No new capital expenses, either for facilities or promotion, would be necessary. American and Continental, on the other hand, are faced with substantial expenditures to establish themselves in totally unfamiliar markets. When American applied for a Miami-London route in 1980, it estimated that its pre-operating and development expenses (capital rather than marginal costs) would run from $1.5 to 2 million.[38] There is no reason to think its expenses here will be any less. In fact, they are likely to be substantially more. Braniff's actual D/FW-London pre-operating and development expenses in 1978, as reported to the CAB, were.$4.5 million.[39]
 
 
 123
 The short-term choice of Continental is equally problematic. In an application to the CAB for this same Central Zone-Venezuela certificate authority, filed on 23 March 1982, Continental estimated that its first year advertising and publicity expenses alone would be.$1.4 million.[40] Furthermore, Continental will have to subtract from its domestic service in order to provide an aircraft for this route, while other applicants had idle aircraft readily available.[41] In addition, under Venezuela's labor laws, 75% of a foreign corporation's employees must be Venezuelan nationals. After a Venezuelan employee has completed a thirty-day probation period with the foreign concern, the employee cannot be terminated unless the employer pays the worker an indemnity, as determined by a Venezuelan court. Thus, Continental would face a substantial liability if it were not awarded permanent authority to Venezuela. Finally, the Venezuelan government has always shown great reluctance to grant new foreign carriers permission to land at its airports. Continental did not receive this permission until 3 July and, thus, for almost seven weeks there was no U.S. carrier on the Central Zone-Venezuela route. Pan Am, on the other hand, since it already had stations in Venezuela, would apparently have had little trouble instituting temporary service. The Board, therefore, by ignoring Kodiak and its own past procedures, has done a substantial injury to U.S. commercial interests and to passengers travelling between the Central Zone and Venezuela.
 
 
 124
 Once a transcript of the 14 May meeting came to light through a FOIA request, the Board could no longer hope to disguise its reliance on long-term selection factors. The Board now claims that that reliance was not improper. The statutory standard for granting an exemption ("consistent with the public interest") is not at odds with the standards for granting certificates ("consistent with the public convenience and necessity"). Why, the Board asks, should we shut our eyes to what are obviously important public interest factors simply because they are relevant to long-term as well as to interim authority? There are three answers to this query.
 
 
 125
 First, the Board is obliged to abide by its own precedent or at least provide an adequate explanation for its deviation. If the necessity of opening a new station was sufficient to disqualify applicants from consideration for exemptions on the routes to Mexico from Florida, Houston, and D/FW, it should have the same effect here, unless the Board provides, as it has not, a sufficient explanation of relevant differences.
 
 
 126
 Second, the Board has prejudiced its selection of a permanent carrier on the routes. The Board cannot help but be aware of the substantial capital investment required by both carriers to institute service, an investment that will be largely lost if they do not receive the permanent awards. Furthermore, Board members have already stated that they chose the carriers they thought best for the long-term. Thus, we have a case not just of possible prejudice but of demonstrated prejudgment, bound to have an influence on any subsequent decision.
 
 
 127
 Finally, the Board's reliance on long-term factors is unacceptable because of the complexity of those factors. There are good reasons for the procedural requirements that apply to any certificate proceeding. They are necessary to establish an adequate factual predicate for the Board's decision. A decision based on the difficulty and expense of instituting interim service, on the other hand, is relatively easy to make, even within the compressed procedures of an emergency exemption hearing.
 
 
 128
 Congress has specifically provided that certification decisions are not to be made without "due notice" of any applications filed, an opportunity for any interested person to "file with the Board a protest or memorandum of opposition to or in support of the issuance of the certificate requested by such application," a "public hearing," and "findings of fact" supported by substantial evidence.[42] Here, the CAB meetings of 13 and 14 May were both covered by a single "Short Notice of Meeting for 13 May 1982" issued on 13 May. The crucial 14 May meeting was treated as simply an extension of the 13 May meeting. None of the applicants had a realistic opportunity to respond to each others applications. It is not even clear that the applicants had sufficient notice to enable them to object to the closure of the 14 May meeting. Then, the order was issued granting an excessively lengthy exemption without any accompanying statement of reasons and findings.[43] Under these circumstances, there is no way the Board could adequately consider the permanent authority factors upon which it chose to rely. Consequently, its reliance upon those factors makes the procedures it followed wholly unacceptable.
 
 
 129
 It will not do for the majority of this court to content itself with an admonition and finger waving at the Board. We should vacate the result reached by such a process. Only in this way can the court insist upon and enforce adequate procedures in the future.
 
 III. Substantial Evidence
 
 130
 The concept of "reasoned decisionmaking" is "in essence the keystone of the Rule of Administrative Law."[44] It is therefore this court's ultimate function, in reviewing administrative decisions, "to assure that the agency has given reasoned consideration to all material facts and issues."[45] In actions taken under the Federal Aviation Act, this scrutiny must include a determination of whether each of the essential elements of a CAB order is supported by substantial evidence.[46]
 
 
 131
 I do not deny that carrier selection is "basically a matter of judgment, often difficult and delicate, entrusted by Congress to the administrative agency."[47] "Courts have no special qualifications in this area for second-guessing the Board as to the merits of its determinations ...."[48] But "we may, and do, require that an agency rely on more than unadorned assertions that it has exercised its expertise on a particular issue. The findings of fact necessary to the agency's analysis and decision must be supported on the record."[49]
 
 
 132
 The emergency context in which the Board made the decisions challenged in this case may lighten, but it cannot eliminate, the substantial evidence requirement.[50] "(T)he area of permissible discretion can be measured in terms of the situation then existing."[51] In the "situation then existing," the Board could have made its decision quickly, on the basis of the limited information before it, if it had confined its attention to short-term selection criteria for which the relevant facts are few and easy to ascertain. Instead, the Board chose to broaden its inquiry, taking account of complex, long-term factors. I have explained above why the procedures the Board followed were unacceptable given this choice. But even assuming the procedures followed were proper, the Board's decisions should not stand. The Board broadened its inquiry without broadening its factual base. It chose to make dispositive factors about which it had inadequate information. The Board simply failed to develop the evidence to which it could apply its expertise.
 
 
 133
 I do not purport to say whom the Board should have selected for the routes in question. That clearly is not a proper role for the court. I say only that there is too little evidence in the record to support the choices made. The CAB overrode short-term considerations and made its selections based on long-term factors which are unsupported by any solid evidence.
 
 
 134
 As noted above, American, despite its lack of a London station, was chosen for the D/FW-London route because of its strong position at D/FW and because the Board wanted to promote intergateway competition. Neither of these rationales has been substantiated, however. American's strong position at D/FW is supposed to promote the convenience of London-bound passengers. There are only a limited number of U. S. cities which may have direct international flights. International passengers from other cities must travel through these "gateways." If an airline with an international route has a strong domestic network fanning out from its gateway, then passengers from nongateway cities served by the carrier can travel internationally without having to change airlines, though they must still, usually, change planes. Braniff flew to D/FW from 33 points. American flies there from 60 points, including 31 of the 33 cities served by Braniff. Thus, the Board concluded, by choosing American, more passengers will be provided with a convenient one-stop route to London. Conversely, American will be successful on the route vis a vis its foreign competitor, BCAL.
 
 
 135
 There is an obvious problem with this argument. Braniff suffered huge losses on the D/FW-London route.[52] Thus, it is not immediately clear why duplicating Braniff's service should be thought a sure road to success.[53] If the public wanted the product, presumably they would have paid for it when Braniff was offering it. The Board, however, presented no data on the number of passengers using Braniff's feed system into the D/FW-London route. It provided no factual support for the proposition that "behind-gateway benefits" are still significant to the travelling public, despite today's domestic deregulation.
 
 
 136
 The Board noted that while another applicant, Delta, provides nonstop service to D/FW from 31 points, it duplicates Braniff's service on only 15, as opposed to 31 for American. But the Board's analysis stopped there. No investigation was made of whether those 16 extra flights provide significant, or any, D/FW-London traffic. Two of those 31 cities from which American flies nonstop to D/FW are Chicago and Washington, D. C., both of which have direct service to London. Surely the Board doesn't suggest that passengers will fly from these cities in the opposite direction of London in order to take American's new connecting service. At oral argument, counsel for the CAB mentioned Denver and San Diego, neither of which has direct service to London, as likely candidates for the D/FW connection. But, again, neither route would make sense. Passengers from Denver are unlikely to travel to D/FW, which is no closer to London than Denver, when they can go straight through the Minneapolis-St. Paul gateway, or, with only a slight deviation, through the huge Chicago gateway. Similarly, San Diego passengers can more directly go through L.A. or San Francisco along the polar route.
 
 
 137
 The point of this exercise is not to show that no passengers will fly one-stop to London via D/FW. Undoubtedly some will. But how many, and from where? These are the crucial questions the Board must resolve if it wants to rely upon this factor in choosing a carrier. I don't know what the answers are. But it is clear that the Board doesn't either. Yet the Board, without the facts necessary to it, blithely made its decision based on pure speculation that American's "feed" in D/FW would be crucial to its success and was a sufficient reason for favoring it over the other applicants.
 
 
 138
 The Board also failed to give any consideration to the importance of feed at the London end of the route. Pan Am and TWA have numerous flights from London to Continental Europe. American has none. While these continental flights are all into and out of Heathrow, whereas the D/FW-London flight lands at Gatwick, the gap between Gatwick and Heathrow is not so great that thousands of passengers do not bridge it every day. In contrast to many of the thirty-one American flights into D/FW which originate from cities highly unlikely to produce any passengers continuing on to London (e.g., Washington, Chicago, Denver, San Diego), the existing Pan Am and TWA flights to and from the east and south link cities from which passengers might logically funnel through London (e.g., Frankfurt, Madrid, Rome, Athens, Cairo, the Arab countries). The attraction of one-carrier service, even with a change in airports, could be strong because of security in baggage handling and assured convenience of connecting flights. The carrier selected by the Board, American, has nothing to offer the passenger beyond London; other petitioners here arguably do.
 
 
 139
 The same analysis might be applied to the Central Zone-Venezuela route. Pan Am long has had flights south from Caracas to Rio, Sao Paulo, Buenos Aires, and other South American cities. The Board's choice, Continental, has nothing. Again, the Board was without the facts necessary to decide whether this factor is important or not, and, indeed, seemed to be totally unaware that this could be as relevant a factor as "feed" at the D/FW end.
 
 
 140
 The Board's second rationale, the promotion of intergateway competition, is equally fraught with unappreciated complexity. There are three "southern-tier" gateways to London: Houston, Atlanta, and D/FW. By assigning each of these gateways to a different carrier, the CAB seeks to ensure that travellers from London to the southern U. S. will have the maximum number of carriers competing for their business. Thus, since Pan Am flies to London out of Houston, and Delta out of Atlanta, the Board preferred to choose American for the D/FW route.[54] But the Board made no attempt to analyze or document the true extent of competition between these gateways. It was thus unable accurately to weigh this factor in its decisional calculus.
 
 
 141
 Furthermore, even on the theoretical level at which the Board operated, the intergateway competition argument seems to be undermined, at least in part, by the Board's emphasis on feed. If traffic naturally flows to London through Atlanta from, say, Montgomery, Alabama or Jackson, Mississippi, to that same extent an Atlanta-London route is unlikely to compete with a D/FW-London route. Only from a few cities is the marginal convenience of passing through one city rather than another likely to be so minimal as to make the routes truly competitive.
 
 
 142
 Finally, while emphasizing competition between gateways, the Board completely ignored the anti-competitive effects of further enhancing American's position at D/FW. American and Braniff together accounted for some 67% of the domestic traffic into and out of D/FW. American's market share was 31%. With Braniff's collapse, and the "slot" constraints imposed in the wake of the Air Traffic Controller's strike that limit new entry, American will stand in a dominant position at D/FW. The eleven-month award of the D/FW-London route to American will inevitably increase that dominance.[55]
 
 
 143
 The Board, however, chose to by-pass this issue.
 
 
 144
 Opposing carriers have argued that selecting American will have an anticompetitive effect by increasing its dominance at D/FW. This issue cannot be adequately evaluated until the situation has stabilized, and it is more appropriate to consider it in a long-term case.[56]
 
 
 145
 Since the Board realized it couldn't adequately evaluate competition at the gate, it is unclear why the Board felt it could evaluate intergateway competition. The Board cannot select some factors to consider and others to ignore without some solid basis. If the Board wants to consider factors affecting competition, then it must give them thorough consideration. Otherwise its selection will be skewed by a random choice of "relevant" factors. It is undoubtedly true that in the short time available the Board could not make a proper evaluation of the effects of its choice on competition at the gateway. But the difficulty with evaluating intergateway competition was at least as acute, and should have counseled the same restraint.
 
 
 146
 Similar unresolved questions mar the choice of Continental for the Central Zone-Venezuela route. The Board again failed to document its claims of the importance of behind-gateway service or intergateway competition (here, between Miami and the Central Zone). We are thus unable to find, as we must, that those claims are supported by substantial evidence.
 
 
 147
 The majority acknowledges that "substantial arguments" could be made against the Board's connecting-service and intergateway competition criteria and that they may prove, on reexamination, to rest on an assumption that is "unrealistic," even a "chimera."[57] But the majority feels that such a reexamination is unnecessary "in this truncated proceeding." The Board has relied on these criteria in the past and could not be expected "sua sponte, in a few hours' time, (to realize their) invalidity ...."[58] But, of course, that is precisely the point. The inability of the Board adequately to evaluate the validity of these factors in this "truncated proceeding" is precisely the reason the Board should not have relied upon them. But having chosen to rely upon them the Board cannot now hide behind the time pressures that prevented it from developing an adequate factual record.
 
 
 148
 A further reason offered by the Board for its selection of Continental was that the selection of Pan Am, the carrier most prepared to institute temporary service, might prejudice U. S. treaty rights with Venezuela. Our current treaty with Venezuela allows for more than one U. S. carrier to fly there. Venezuela, however, has been reluctant to accept more than one carrier and accepted Braniff, in addition to Pan Am, only after much foot-dragging. The Board feared that if it designated Pan Am for the Central Zone-Venezuela route, even though just on a temporary basis,
 
 
 149
 we might be leaving an incorrect impression, namely that the United States was changing its policy to one of single-carrier designation. This could have the practical effect of creating a foreign relations confrontation and accordingly could result in aggravating rather than removing the risk of prejudice to our carrier selection decision in any future proceeding.[59]
 
 
 150
 The CAB certainly can, and should, take account of foreign policy concerns in its choice of a carrier, even on an interim basis. And it is not for a reviewing court to second-guess the Board's foreign policy judgment, provided that judgment is supported by substantial evidence. But there is no indication in this record that the CAB, either in its 14 May meeting or its 27 May order, actually came to grips with the comparative negotiating positions of the United States and the Venezuelans on the air routes. As this court has stated before, and as the majority acknowledges, "(t)he board cannot wrap its decisions in some mystique of foreign policy or purported expertise in international negotiations to achieve a non-reviewable status for the facts underlying its most important and sensitive decisions."[60]
 
 
 151
 International air service is almost invariably agreed to on the basis of strict reciprocity-equal landing rights in the two countries with equal flight opportunities for each country's respective airlines. The U. S. has several national airlines flying international routes. Venezuela has only one, which may account for its desire to have only one U. S.-flag carrier coming into Venezuela. Yet, provided the total number of flights by U. S. carriers is the same as that of the Venezuelans, and provided the Venezuelans have comparable landing rights at the U. S. airports, it is difficult to see why Venezuela would feel it necessary, in the long run, to insist on only one U. S. carrier. Indeed, the agreement already in force gives the U. S. a legal right to designate more than one carrier and the U. S. has, in most instances, followed a policy of designating different carriers from different gateways.
 
 
 152
 Furthermore, the U. S. is in a position to insist on adherence to this agreement whether or not, in the current emergency situation, it reduces its service to one carrier. The U. S. is certainly in an equal, if not better, bargaining position than Venezuela. The maintenance and quantity of air traffic between the U. S. and Venezuela is of some importance to the U. S., but in proportion to the remainder of U. S. international air traffic, especially in the North Atlantic, it is not of overriding importance. In contrast, the air traffic between Venezuela and the U. S. not only represents a sizeable portion of Venezuela's total international traffic, it is also of significant economic importance to Venezuela. The traffic flowing from the Central Zone to Venezuela is comprised in great part of American businessmen and technicians dealing with and servicing the Venezuelan oil industry. There is also a substantial reverse flow of Venezuelan businessmen connected with the oil industry and, principally over the Miami gateway, a large tourist traffic. The flow of oil business and technology is admittedly important to the U. S. But it is vital to Venezuela, and it is therefore vital for Venezuela to maintain convenient air service with the U. S. A reduction of such service (which would inevitably be reciprocal) would redound comparatively to the greater disadvantage of Venezuela. Under these circumstances, the Board's decision to give overpowering consideration to maintaining two U. S. carriers in Venezuela for what should only be a few interim months is, if not irrational, at least without any foundation.[61]
 
 
 153
 In sum, the Board has failed to make any factual case at all in support of its interim exemption awards. The Board chose to override short-term selection criteria that argued strongly against the awards made here. It did so without examining or substantiating the long-term criteria upon which it chose to rely. But examination and substantiation of the decisional criteria cannot be deferred to a subsequent proceeding. And mere assertion that certain factors are relevant to the decisions is not a substitute for solid data. The statute requires that this order be supported by substantial evidence. It is not. Therefore, the order should not be allowed to stand.
 
 
 
 [1]
 In this opinion we refer to the following airlines by their popular names: American Airlines, Inc. (American), Braniff Airways, Inc. (Braniff), Continental Air Lines, Inc. (Continental), Delta Air Lines, Inc. (Delta), Eastern Air Lines, Inc. (Eastern), Pan American World Airways, Inc. (Pan Am), and Trans World Airlines, Inc. (TWA)
 
 
 [2]
 The Central Zone gateways are DFW, Houston, and New Orleans
 
 
 [3]
 See Part II infra
 
 
 [4]
 Notably, Braniff had been forced by its financial situation to sell most of its South American routes in April. The CAB disapproved a sale to Pan Am, based largely on "competitive" considerations, but then approved a sale to Eastern. Those CAB orders are under review in D.C.Cir. Nos. 82-1482 and 82-1555 through 82-1557
 
 
 [5]
 The CAB received eight applications for each of the two routes at issue here and two applications for a Mexico City route awarded to Eastern, which is not at issue here
 
 
 [6]
 Pursuant to the Government in the Sunshine Act, 5 U.S.C. § 552b (1976), a transcript of this meeting has been released to Delta. The meeting was initially closed, and a sixth of the transcript has been deleted because of foreign policy discussions allegedly within id. § 552b(c)(9)(B). Delta is challenging administratively the CAB's invocation of Exemption 9(B) to justify withholding portions of the transcript. The propriety of the CAB's use of Exemption 9(B) is not before us. As we note in Part II infra, however, even if this exemption was properly invoked it was error for the CAB to hold the entire meeting closed
 
 
 [7]
 Under this nation's bilateral treaty with the United Kingdom only one U.S.-flag carrier may operate the DFW-London route nonstop at any given time. As a practical matter, the United States may designate only one carrier on the Central Zone-Venezuela route. See note 23 infra
 
 
 [8]
 See Kodiak Airways, Inc. v. CAB, 447 F.2d 341 (D.C.Cir.1971)
 
 
 [9]
 Counsel for one of the airlines suggested at oral argument that he was not aware, before the meeting took place, that it would be closed
 
 
 [10]
 Any Federal court otherwise authorized by law to review agency action may, at the application of any person properly participating in the proceeding pursuant to other applicable law, inquire into violations by the agency of the requirements of this section and afford such relief as it deems appropriate. Nothing in this section authorizes any Federal court having jurisdiction solely on the basis of paragraph (1) to set aside, enjoin, or invalidate any agency action (other than an action to close a meeting or to withhold information under this section) taken or discussed at any agency meeting out of which the violation of this section arose
 5 U.S.C. § 552b(h)(2) (1976). Our jurisdiction in this case derives from 49 U.S.C. § 1486(a) (1976), not from 5 U.S.C. § 552b(h)(1) (1976). The first sentence of § 552b(h)(2), rather than the second, applies to this case and authorizes us to "afford such relief as (we) deem( ) appropriate." See H.R.Rep.No.1441, 94th Cong., 2d Sess. 22-23 (1976) (conference report).
 
 
 [11]
 This is the remedy we have ordered in the past for Sunshine Act violations. See Common Cause v. NRC, 674 F.2d 921, 938-939 (D.C.Cir.1982)
 
 
 [12]
 The CAB contends that we may not examine this transcript. This contention is meritless. In SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), the Supreme Court emphasized that a court may review agency action "solely" on the basis of "the grounds invoked by the agency." Normally we do this by considering an agency's contemporaneous official explanation of its action, but in this case there is no such explanation. Order 82-5-145 contrasts starkly with an order prepared before announcement of an agency decision, because the latter type of order, even if prepared by the staff, is sure to be scrutinized by CAB members themselves before a decision is irreversibly made. Up to the point of announcement, agency decisions are freely changeable, as are the bases of those decisions. Once the decision has been announced, and especially once it has taken effect, there is an overwhelming institutional bias in favor of justifying the result in any way possible-i.e., rationalizing it post hoc. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). The "factors that were considered," id., and the grounds actually "invoked by the agency," Chenery, supra, 332 U.S. at 196, 67 S.Ct. at 1577, are discernible from the transcript
 The cases prohibiting "inquiry into the mental processes of administrative decisionmakers," Overton Park, supra, 401 U.S. at 420, 91 S.Ct. at 825 (citing United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)), present no bar to our examination of the transcript. Those cases involve attempts to gain insight into the decisionmaker's mind by obtaining otherwise unavailable documents or by questioning the decisionmaker. See, e.g., Nat'l Courier Ass'n v. Board of Governors of FRS, 516 F.2d 1229, 1242 (D.C.Cir.1975); Montrose Chemical Corp. v. Train, 491 F.2d 63, 64, 68, 69 (D.C.Cir.1974). Congress, through the Sunshine Act, has dictated that a transcript of this meeting be made available to the entire public. We will not close our eyes to it.
 Finally, we reject out of hand the CAB's suggestion that we should not examine the transcript because of the "considerable give and take in the deliberative process that is not reflected in the meeting * * *." Brief for respondent at 19 n.13. This suggests only that the Board may have engaged in further violations of the Sunshine Act. Meetings "are not intended to be merely reruns staged for the public after agency members have discussed the issue in private and predetermined their views. The whole decisionmaking process, not merely its results, must be exposed to public scrutiny." S.Rep.No.354, 94th Cong., 1st Sess. 18 (1975), quoted in Common Cause v. NRC, supra note 11, 674 F.2d at 930.
 
 
 [13]
 We note also that, until oral argument, no party had asked that we base our decision in this case on Sunshine Act violations. Section 552b(h)(2), unlike § 552b(b), premises inquiry into Sunshine Act violations on "the application of any person properly participating in the proceeding * * *."
 
 
 [14]
 The public seeking to travel between Central Zone gateways and Venezuela has in fact been disrupted because the Venezuelan government did not until early July give Continental its permission to land there. But only Pan Am could possibly have obtained quick permission from Venezuela to fly these routes, and this is far from certain, since the Venezuelan government generally fights expansion of the service of any given carrier as well as designation of new carriers. As we note in text at pp. 38-46 infra, the CAB reasonably concluded that Pan Am would be a poor choice for the interim authority to Venezuela. It was rational for the Board to choose quickly among remaining applicants so that negotiations with the Venezuelan government could begin. We also note that the City of New Orleans, an intervenor in these cases, supports the CAB's award to Continental despite the disruption that has taken place in its economy
 
 
 [15]
 Accord, Nat'l Airlines, Inc. v. CAB, 306 F.2d 753, 759 (D.C.Cir.1962). But cf. American Smelting & Refining Co. v. FPC, 494 F.2d 925, 933 (D.C.Cir.1974) ("(n)o emergency can excuse (statutory) procedural requirements"). To the extent, if any, that American Smelting is inconsistent with United States v. FCC, 652 F.2d 72 (D.C.Cir.1980) (en banc ), the latter decision-an en banc decision rendered after American Smelting-controls. Moreover, these cases all involve statutory hearing requirements. The present case is a stronger one for excusing noncompliance with a procedural requirement, which in this case is findings of fact. Both a hearing requirement and a factfinding requirement assist in judicial review and help assure considered agency decisions. Postdecision findings, such as Order 82-5-145, come closer to fulfilling these goals than postdecision hearings generally will
 
 
 [16]
 Furthermore, the CAB was aware that some passengers had actually been stranded despite the availability of alternative accommodations. See Transcript of May 14 Meeting (Transcript) at 9, 51
 
 
 [17]
 The CAB did receive some responses before it decided, but it gave the airlines no general opportunity to file responses
 
 
 [18]
 Order 82-5-145 at 5, 6-8, 9-10; Transcript at 32, 64, 73. Duplication of Braniff's service to U.S. points beyond the gateway point depends, of course, on the number of U.S. cities served by each carrier from those gateway points ("hub strength"). This consideration is discussed in Transcript at 31, 40-41, 62, 72
 
 
 [19]
 Order 82-5-145 at 4-5. The speed with which, and conditions under which, each carrier would institute service were the very first factors listed in Attachment C to the CAB staff's summary of applications received. This document, released to Delta under the Freedom of Information Act, was considered a useful summary by the Board. Transcript at 6. This factor did not meaningfully distinguish any of the applicants for DFW-London authority, and did not meaningfully distinguish among Venezuela applicants except for Pan Am, which most of the Board considered a poor choice for other reasons. See text at p. 46 & n.36 infra. Therefore, it is not surprising that the Board never discussed promptness of replacement at length, instead noting, as the head of the CAB's Bureau of International Aviation summarized, that "the carriers selected come very, very close to matching identically what Braniff had in the market, and therefore would be the least disruption and the most continuity." Transcript at 73
 
 
 [20]
 Order 82-5-145 at 5, 8, 10; Transcript at 41, 43, 44, 62. Member Dalley cast his decisive vote in favor of American because of the benefits of intergateway competition. Transcript at 71
 
 
 [21]
 See text at pp. 40-44 infra
 
 
 [22]
 Obviously, allowing carriers to compete at each gateway would be more effective, but under a bilateral agreement the United States may allow only one carrier to serve London from each of these gateways
 
 
 [23]
 On June 8, 1979 the CAB granted both Braniff and Continental exemption authority to serve two different Central Zone-Venezuela routes. Previously, one U.S.-flag carrier (Delta) had served these routes. When Delta ceased serving these routes the next day, the Venezuelan government refused to allow either Braniff or Continental in even though the bilateral treaty between the United States and Venezuela allows multiple-carrier designation. For nearly a year the Central Zone had no single-plane U.S.-flag service to Venezuela. The diplomatic impasse was only resolved after February 1980, when the United States withdrew its designation of Continental, leaving only Braniff to fly these routes. Brief of intervenor New Orleans parties at 7 & n.2 (Exhibit A); Letter from Thomas L. Ray, Acting Associate General Counsel, CAB, to George A. Fisher, Clerk, Answer to Question 2, at 3-4 (June 7, 1982). Braniff and Pan Am have both had difficulty with the Venezuelan government when they have tried to increase their levels of service. Id. at 4
 
 
 [24]
 For example, the following exchange occurred at oral argument:
 THE COURT: What is your position on the southern-tier gateway factor? Delta already has Atlanta. The Board says, "We should allow a third carrier-neither Delta nor Pan Am-to service Dallas/Fort Worth." To what extent are these gateways actually competitive?
 COUNSEL FOR DELTA: They are competitive to some extent; all gateways are competitive. But again that is a long-term selection factor. That is the basis upon which, for example, the Board selected Braniff instead of Pan American for Dallas originally-because Pan American got Houston.
 (Emphasis added.) The contention that the factor was invalid in the short term merely because it is a "long-term selection factor" is addressed in text at pp. 42-43 infra.
 
 
 [25]
 It is on this point that we appear to be in most fundamental disagreement with the dissent. The dissent reasons that because the Board could not realize the supposed invalidity of these established criteria in this proceeding, it could not continue to assume them valid. Dissenting opinion at 44. We do not believe the Board is limited, when using established criteria in a special case such as this, to those it can prove valid to a judge's satisfaction. The dissent also joins petitioners, and apparently some past CAB decisions, see text at pp. 44-45 infra, in an overbroad reading of Kodiak Airways, Inc. v. CAB, supra note 8, as precluding CAB consideration of so-called "long-term factors." See text at pp. 42-44 infra
 
 
 [26]
 There is no doubt that the intergateway-competition policy derives from the Transatlantic Route Proceeding, 75 CAB 616 (1978). Moreover, both that policy and the "strong hub" policy, see Transcript at 31; note 18 supra, were applied to each applicant in a column headed "Traditional Long-Term Criteria" in a handwritten summary of the applications prepared by the CAB's staff for the May 14 meeting
 
 
 [27]
 The CAB advances this view explicitly in neither its orders nor its brief in this court, but it was clearly expressed in the May 14 meeting:
 MS. SCHAEFFER (sic ): * * * I cannot help but think that when we choose a carrier for the short-term, there is certainly quite frankly a certain bias that does exist in favor of that. We are trying to make the best choice for the short-term. And hopefully if we are right, it will become long-term.
 MR. LACHTER: It certainly is easier. Because the best choice in the short-term tends to be the best choice in the long-term.
 MS. BAILEY: But that is not always the case.
 MR. DALLEY: Since the Board is merging the two, it does not matter very much.
 Transcript at 66.
 
 
 [28]
 In Kodiak Airways, Inc. v. CAB, supra note 8, there was an ongoing certificate proceeding in which both Kodiak Airways, Inc. and Wien Consolidated Airways, Inc. were applicants. Western Air Lines, Inc. already served the route in question but wished to cease operating it. The Board initially maintained the status quo by denying Western permission to suspend service and by denying Kodiak's, Wien's, and others' applications for exemption authority "because they 'raised difficult and complex questions including issues of carrier selection and mutual exclusivity' which 'would be more appropriately decided after the development of a complete evidentiary record in the pending Alaska Service Investigation.' " 447 F.2d at 343. But then the Board turned around and, in the middle of the Alaska Service Investigation, granted Wien the exemption authority it had earlier denied, saying that "Wien was clearly the best qualified." Id. at 344. The Board could have maintained the status quo merely by having Western continue to fly the route, id. at 354, and it made inadequate findings as to what "immediate or compelling need," id. at 355, and "unusual circumstances," id. at 356-357, required designation of a new carrier before the certificate proceeding was finished. The Board's claim that it kept an open mind in the certification case thus rang hollow. In the present case, by contrast, the Board could approximate the status quo ante only by designating a replacement carrier for Braniff
 
 
 [29]
 It hardly follows, of course, that the procedural strictures of § 1371 are a prerequisite to consideration of factors that may eventually bear on an award of certificate authority
 
 
 [30]
 Member Dalley stated somewhat cryptically that the Board was "merging" the long- and short-term cases. See note 27 supra. It must be remembered, however, that Member Dalley was the sole dissenter from the award of the Venezuela route to Continental, which was under discussion at the time. Like many a person who has found himself outnumbered in a meeting, Member Dalley may merely have overstated a criticism of what the majority was doing. The other two CAB members who spoke to the point tempered their remarks by noting that a good short-term applicant was also a good long-term choice only "if we are right" in assessing the public interest factors and that this was "not always the case." See note 27 supra. These remarks leave no doubt that the CAB intends substantial further evaluation of these applicants in the certificate case
 
 
 [31]
 In this case the Board had to select among competing applicants; it would not have been "proper to refuse to grant any of these applications," Kodiak Airways, Inc. v. CAB, supra note 8, 447 F.2d at 354. Any statement the Board made as to the long-term preferability of the applicants it selected, therefore, was an equivocal one. Cf. note 28 supra
 
 
 [32]
 Boston-London Exemption, Order 80-5-8 (CAB May 20, 1980). In this case World Airways was not present in London, but it was selected on the basis of public interest factors. Pan Am seeks to distinguish this case because "it was not reviewed by a court; and it is inconsistent with the Board's approach in the Florida-Mexico City Investigation." Brief for Pan Am at 29 n.15. But the cases on which Pan Am relies, Florida-Mexico City and Houston-Acapulco, were also not judicially reviewed. Inconsistency between those cases and Boston-London, moreover, suggests not that Boston-London should be disregarded, but that the CAB has followed different approaches in different past cases; we will not invalidate CAB action just because it follows one approach rather than the other
 Pan Am also argues that "in Order 80-5-8, the Board conducted an in depth evaluation * * * and concluded that the investment requirements would be de minimus (sic ), regardless of the carrier chosen." Brief for Pan Am at 29 n.15. The CAB obviously lacked the time in the present case to conduct any in-depth evaluation of required investments, and it could properly fall back on its knowledge, accumulated in part from the Boston-London case, that the startup of operations in London was not a major financial undertaking.
 
 
 [33]
 We went on, of course, to invalidate the award in Kodiak, but we did so because of factors not present here, such as the absence of "an immediate or compelling need" for an exemption to be granted, 447 F.2d at 355, and the Board's inadequate finding of "unusual circumstances," id. at 356-357. In the present case there was certainly an immediate and compelling need for an exemption, and there were clearly unusual circumstances. This latter requirement, moreover, has been removed from the statute. Compare 49 U.S.C. § 1386(b)(1) (1976) with 49 U.S.C. § 1386(b)(1) (Supp. III 1979)
 
 
 [34]
 The CAB's general counsel referred to "station costs of $100,000 difference." Transcript of 30 (emphasis added). Even if American's startup costs were in the millions of dollars, they might differ from those of the other carriers by only a few hundred thousand dollars. Just as American had to spend large amounts of money on advertising to develop name recognition in London, Pan Am and TWA had only skeletal operations at DFW and would have had to advertise heavily to achieve name recognition there
 
 
 [35]
 We seriously doubt, however, that the CAB will be prejudiced in favor of American if, contrary to its own representations, it is unable to make the route profitable
 
 
 [36]
 Both the meeting transcript at pages 66-69 and the CAB's order reflect near unanimity that Pan Am would be a poor choice for this award. Only Members Dalley and Schaffer ever expressed any thought that Pan Am's application was a good one, and in the end Member Schaffer declared that the real choice was between American and Continental. Transcript at 69
 It would surely have been irresponsible, and probably reversible error, for the CAB to ignore the history of negotiation between the United States and Venezuela and engage in the sheerest speculation as to the relative bargaining positions of the two nations. But see dissenting opinion at 61-62. Of course, foreign policy considerations are inherently complex, long-term factors, and a carrier adjudged best in the short term because of such considerations will often be the best choice in the long term. Yet even the dissent concedes that the Board "certainly can, and should, take account of foreign policy concerns in its choice of a carrier, even on an interim basis," id. at 61, despite otherwise contending that the Board should, because of "complexity" and "prejudgment," "shut (its) eyes" to factors relevant to long-term selection, id. at 56.
 
 
 [37]
 See New York-Ottawa Proceeding, Order 81-12-159 (CAB Nov. 12, 1981); U.S.-People's Republic of China Proceeding, Order 80-11-3 (CAB Oct. 31, 1980); Standard Foreign Fare Level Investigation, Order 80-8-66 (CAB Aug. 12, 1980)
 
 
 [38]
 Under the terms of Orders 82-5-77 and 82-5-145 the temporary awards to American and Continental will terminate as soon as the certificates granted in these cases become effective
 
 
 *
 On July 15, 1982, the court received a letter from counsel for Pan Am indicating that Pan Am wished to withdraw its petition for review insofar as that petition challenged the award of the Venezuela route to Continental. The court, however, had received no formal motion to withdraw this portion by the time this opinion went to the printer. On July 21, 1982, also after this opinion went to the printer, the court received (1) a letter from counsel for the CAB advising that the CAB has now instituted certification cases on the two routes in question in these cases, and (2) a motion by Pan Am to withdraw its petitions for review in D.C.Cir. Nos. 82-1555 through 82-1557. See note 4 supra. Rather than delay issuance of the opinions in these expedited cases so that they can be modified to take account of these developments, we have decided to release the opinions in their present form. None of the developments referred to in this footnote affects the court's mandate
 
 
 [1]
 Federal Aviation Act § 401(a), 49 U.S.C. § 1371(a) (Supp. III 1979)
 
 
 [2]
 Id. § 1386(b)(1)
 
 
 [3]
 14 C.F.R. § 302.400 et seq, (1982)
 
 
 [4]
 Id. § 302.410
 
 
 [5]
 Application of Delta Airlines, Inc. for an Emergency Exemption, Motion for Stay, App. 3 at 1 ("there is an immediate need for a replacement carrier in this market to meet the public interest"); Application of Pan American World Airways, Inc. for an Emergency Exemption, Motion for Stay, App. 5 at 1 ("The need for prompt replacement of this operation is obvious. A U.S.-flag service has been eliminated, the passengers will be inconvenienced, and the U.S.-flag market will be threatened unless a new carrier can institute service promptly."); Application of Trans World Airlines, Inc. for an Emergency Exemption, Motion for Stay, App. 6 at 1 ("There are compelling public interest reasons for the Board to take action assuring that there is no significant gap in service.... TWA is prepared to commerce service tomorrow, May 14, 1982.")
 
 
 [6]
 U. S. v. FCC, 652 F.2d 72, 96 (D.C.Cir.1980) (en banc) ("the relative urgency of a decision is a thoroughly appropriate factor for an agency to consider when crafting its procedures"); National Airlines, Inc. v. CAB, 306 F.2d 753, 759 (D.C.Cir.1962) ("It seems clear that the Board is not required to use the same procedure for interim relief, if an emergency exists, as is required for final action.")
 
 
 [7]
 Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). See also Kodiak Airways, Inc. v. CAB, 447 F.2d 341 (D.C.Cir.1971)
 
 
 [8]
 American Smelting and Refining Co. v. Federal Power Comm'n, 494 F.2d 925, 933 (D.C.Cir.1974)
 
 
 [9]
 Delta Airlines v. CAB, 564 F.2d 592, 597 (D.C.Cir.1977); Air Line Pilots Assoc., Int'l v. CAB, 494 F.2d 1118, 1123 n.15 (D.C.Cir.1974)
 
 
 [10]
 West Virginia Public Service Comm. v. U. S. Dept. of Energy, 681 F.2d 847, 859 (D.C.Cir.1982)
 
 
 [11]
 49 U.S.C. § 1485(f). This requirement is echoed in the Board's own regulations. "When a case stands submitted to the Board for final decision on the merits, the Board will dispose of the issues presented by entering an appropriate order which will include a statement of the reasons for its findings and conclusions." 14 C.F.R. § 302.36 (1982)
 
 
 [12]
 494 F.2d at 933 (emphasis added)
 
 
 [13]
 Civil Aeronautics Board Order 82-4-144 (27 April 1982)
 
 
 [14]
 Transcript of 14 May 1982 Civil Aeronautics Board Meeting (Transcript) at 8 (remarks of Mr. Kasper)
 
 
 [15]
 Id. at 50 (remarks of Mr. Kasper)
 
 
 [16]
 Id. at 8-11 (remarks of Members Smith and Dalley)
 
 
 [17]
 Id. at 11
 
 
 [18]
 On the significance of the transcript and the propriety of our reliance upon it, see the majority's per curiam opinion at n.12, with which I agree
 
 
 [19]
 447 F.2d 341 (D.C.Cir.1971)
 
 
 [20]
 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945)
 
 
 [21]
 447 F.2d at 350
 
 
 [22]
 CAB Order 78-6-59 (8 June 1978) p. 5
 
 
 [23]
 Id. at 6
 
 
 [24]
 CAB order 82-4-118 (21 April 1982) p. 5 (emphasis added)
 
 
 [25]
 Transcript at 6 (remarks of Mr. Kasper)
 
 
 [26]
 Id. at 15-16 (emphasis added)
 
 
 [27]
 Id. at 28 (remarks of Mr. Kasper)
 
 
 [28]
 Id. at 29 (remarks of Mr. Mellups)
 
 
 [29]
 Id. at 30 (remarks of Member Smith)
 
 
 [30]
 In preparing summaries of the applications the Board's staff discussed feed and market structure under the heading "Traditional Long-Term Selection Factors." In contrast, on a separate sheet, under the heading "Traditional Short-Term Selection Factors," the staff discussed whether the applicant already had stations at the points on the route, especially emphasizing whether the carrier was approved for service by England or Venezuela
 
 
 [31]
 Transcript at 31-32, 36-37, 39-44, 72
 
 
 [32]
 Id. at 41-44, 71-72
 
 
 [33]
 Id. at 60, 62, 64
 
 
 [34]
 Id
 
 
 [35]
 Id. at 73 (remarks of Mr. Kasper)
 
 
 [36]
 Id. at 66 (emphasis added)
 
 
 [37]
 Id. at 72 (emphasis added)
 
 
 [38]
 Miami-London Route Case, CAB Docket 36764 (1980)
 
 
 [39]
 Braniff's 1978 CAB form 41, Schedule B-10, Atlantic Division
 
 
 [40]
 See Exhibit CO-41 to Continental's application, CAB Docket 40557 (1982)
 
 
 [41]
 Submission by Parties in Response to Factual Inquiries by Court (7 June 1982)
 
 
 [42]
 49 U.S.C. §§ 1371(b), 1485(f), and 1486(e)
 
 
 [43]
 A further flaw in the original order is that it stated that all members of the Board concurred in the choices made. As the transcript of the 14 May meeting reveals, however, this was not the case. The vote on the London route was 3-2, and on the Venezuela route it was 4-1
 The CAB subsequently amended its order to acknowledge the dissents. But while this court was considering whether to grant or deny the stay we were confronted with the alleged fact that the CAB was unanimous in its approval of the awards made. Our consideration of the stay might have been somewhat different had we known that on the London route the Board was as closely split as possible. The CAB's error here is, of course, compounded by the improper closure of the meeting and the failure immediately to furnish a transcript.
 
 
 [44]
 American Public Gas Ass'n v. FPC, 567 F.2d 1016, 1029-30 (D.C.Cir.1977), cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978)
 
 
 [45]
 Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)
 
 
 [46]
 49 U.S.C. § 1486(e). See United Air Lines, Inc. v. CAB, 569 F.2d 640, 652 (D.C.Cir.1978); Pillai v. CAB, 485 F.2d 1018, 1023 (D.C.Cir.1973)
 
 
 [47]
 Delta Air Lines v. CAB, 564 F.2d 592, 597 (D.C.Cir.1977)
 
 
 [48]
 Frontier Airlines v. CAB, 602 F.2d 375, 379 (D.C.Cir.1979)
 
 
 [49]
 West Virginia Public Service Comm'n, 681 F.2d at 859
 
 
 [50]
 American Smelting, 494 F.2d at 933
 
 
 [51]
 Northwest Airlines v. CAB, 303 F.2d 395, 398 (D.C.Cir.1962)
 
 
 [52]
 On the London route alone, Braniff had a net loss of $47.1 million in 1980, $18.6 million in 1981, and.$2.1 million for the first quarter of 1982. Submission by Parties in Response to Factual Inquiries by Court (7 June 1982)
 
 
 [53]
 The Board also purported to rely on the fact that American planned to use a 747 on the route, the same type of plane used by Braniff. But again, in light of Braniff's losses, this reliance makes little sense. Delta's counsel in oral argument pointed out that Braniff's losses on the Dallas-London route came to approximately $20,000 per flight. The operating costs of an L-1011, which both Pan Am and Delta proposed to use, are $17,000 less than the operating costs of the larger 747. There is also a savings in the crew needed for the smaller plane. Why the Board should insist on a carrier which would use a 747, demonstrably more expensive to operate than the L-1011, merely in order to replicate Braniff's routes is a mystery. While the 747 will carry more passengers than the L-1011, there is no showing whatsoever that Braniff was operating this route at full capacity. Indeed, Braniff's consistent losses indicate the contrary
 
 
 [54]
 Transcript at 44. TWA was thought to offer indirect competition. "TWA provides connecting service between Dallas and London via New York and also provides nonstop service from Chicago and one-stop service from Pittsburgh to London." CAB Brief at 24 n.18
 
 
 [55]
 Transcript at 41-42 (remarks of Member Dalley)
 
 
 [56]
 CAB Order 82-5-145 at 10 n.25
 
 
 [57]
 Majority opinion, supra, at 41
 
 
 [58]
 Id. at 41
 
 
 [59]
 CAB Order 82-5-145 at 8
 
 
 [60]
 Pillai v. CAB, 485 F.2d 1018, 1023 (D.C.Cir.1973)
 
 
 [61]
 Venezuela's ultimate decision to allow Continental to commence service on the Central Zone-Venezuela route confirms that the U.S. can obtain compliance with the agreement. The Board's emphasis on whether Venezuela would breach the agreement when a permanent carrier was certified for the route was, thus, misplaced. Venezeula's history of foot-dragging should have, instead, led the Board to focus on the short-term consideration of who was likely to win the approval of Venezuela most quickly to institute interim service. The obvious answer here, as subsequent developments show, was Pan Am, not Continental